John SWANSON, George Swanson, and George C. Swanson Enterprises (PTY.), Ltd., Appellants,

v.

SCHLUMBERGER TECHNOLOGY CORP., Schlumberger Ltd., Appellees.

No. 06–93–00084–CV.

Court of Appeals of Texas, Texarkana.

Nov. 30, 1994.

Opinion Overruling Motion for Rehearing Feb. 22, 1995.

E. Eric Fryar, Susman Godfrey, L.L.P., John M. O'Quinn, O'Quinn, Kerensky, McAninch, Houston, Franklin Jones, Jr., Jones, Jones & Curry, Inc., Marshall, for appellants.

Ben Taylor, Roger Townsend, Fulbright & Jaworski, Houston, John R. Mercy, Atchley, Russell, Waldrop, Texarkana, for appellees.

Before CORNELIUS, C.J., and BLEIL and GRANT, JJ.

## OPINION

GRANT, Justice.

John Swanson, George Swanson, and George E. Swanson Enterprises (Pty.), Ltd. (the Swansons) appeal from a judgment notwithstanding the verdict entered in their suit against Schlumberger Technology Corporation and Schlumberger Ltd. (Schlumberger). The Swansons filed suit alleging that Schlumberger committed common-law and statutory fraud and that Schlumberger breached fiduciary duties owed to the Swansons under a partnership or confidential relationship.

## ISSUES

In three points of error, the Swansons contend generally that the district court erred in entering a j.n.o.v. in favor of the defendants and in failing to enter judgment on the verdict in favor of the plaintiffs. In twenty-three reply and cross-points, Schlumberger contends that the trial court did not err in rendering j.n.o.v., that the evidence is legally and factually insufficient to support numerous jury findings, and that the trial court erred in submitting several questions to the jury over Schlumberger's objections.

## FACTS

According to the evidence, George Swanson believed that a vast field of high quality diamonds had been washed from the continent of South Africa into the ocean by millions of years of erosion. In 1978, he advanced an idea for mining the diamonds in this offshore field. George discussed this idea with his brother John, a minerals con-

sultant, and sought his aid in finding someone with the know-how and equipment to mine the diamonds. Later in 1978, John negotiated with Sedco, Inc. and convinced Sedco to join with the Swansons in attempting to develop an offshore diamond mine. Sedco was experienced in offshore drilling. Through a series of letters, Sedco agreed to join the Swansons in pursuit of the offshore diamonds.

The sea-diamond project had three phases: In Phase I, Sedco was to study the feasibility of offshore diamond mining off the coast of Africa, and the Swansons were to conduct preliminary work necessary to acquiring exclusive operating rights in the area; in Phase II, the parties were to acquire a diamond lease and begin prospecting for diamonds; and in Phase III, Sedco was to undertake commercial mining of the diamonds, with John Swanson and the Swanson Corporation each receiving 2.5% of the net proceeds and an option to purchase up to 5% of the shares of the newly founded mining company. The letter agreements gave Sedco an exclusive option as to whether to proceed with each successive phase of the mining operation. The Swansons were also to receive a consultation fee from Sedco during the first two phases of the operation.

Sedco finished the Phase I feasibility study in January 1979, having determined that the sea-diamond project was both technologically and commercially feasible. In May of 1979, a second letter agreement extended the time period for Phase II because no diamond lease was then available for offshore diamond mining. For the next two years, the Swansons lobbied the South African government for a diamond lease and, in 1981, the government redrew the lease lines in order to create new deep sea leases. The Swansons and Sedco received Lease 3C in July 1983, with Sedco, Inc. and George E. Swanson Enterprises named as co-lessees.

At around the same time, British Petroleum Company was awarded Lease 2C immediately to the north of the Sedco/Swanson lease, and DeBeers was awarded Leases 4C and 5C immediately to the south. In 1984, Sedco, British Petroleum, and DeBeers conducted negotiations aimed at forming a con-

sortium to pool the four leases and jointly develop the mines. According to the testimony of John Swanson, Sedco's general counsel promised that the Swansons would be allowed access to the consortium's prospecting information, the Swansons would be given a seat on the operating committee of the consortium, and Sedco would stay in the project if diamonds were found in commercial quantities. In a third letter agreement, the Swansons gave express consent to the consortium but retained all of the rights granted in the previous letter agreements. Under the terms of the consortium agreement executed in February 1985, the parties, DeBeers, British Petroleum, and Sedco, agreed to stay in the consortium until 21 million rand (approximately $8.6 million) was expended.

In 1985, Sedco merged into a wholly owned Texas subsidiary of Schlumberger, designated as Schlumberger Technology Corporation. Sedco's drilling operations continued to exist under the name Sedco–Forex and a South African subsidiary, called Sedswan Diamonds (Pty.), Ltd., was formed to handle the development of the offshore diamond mines. Schlumberger, however, decided later in 1985 to pull out of the offshore diamond mining project. This decision was apparently in line with Schlumberger's corporate philosophy of investing only in core, established businesses and did not derive from the commercial feasibility of the diamond mine project. The Swansons were unaware of Schlumberger's intention to pull out of the project until almost two years later, by which time Lease 3C had been reissued in the name of Sedswan Diamonds, the newly created subsidiary of Schlumberger.

The Swansons contend that Schlumberger failed to keep Sedco's promise that it would keep the Swansons informed regarding the project and award the Swansons a seat on the consortium's operating committee. The Swansons further contend that they were dependent on Schlumberger for all their information on the project. Schlumberger contends that during this period the Swansons came to distrust Schlumberger and sought legal advice regarding their relationship.

In January 1987, Schlumberger offered to sell their interest in the consortium to De-Beers and British Petroleum, but both companies refused to buy out Schlumberger subject to the Swansons' rights. Over the next thirteen months, Schlumberger negotiated with the Swansons in an attempt to buy out their alleged interest in the consortium. During these negotiations, Schlumberger repeatedly downplayed the potential profitability of the sea-diamond project, suggesting that no technology existed that could efficiently mine the diamonds. Also during this period, the Swansons repeatedly threatened to sue Schlumberger and, at one point they even drafted a petition alleging conspiracy, breach of contract, and illegal dilution.

In February 1988, Schlumberger offered the Swansons two million rand (stipulated at trial to be the equivalent of $814,000.80) in exchange for the Swansons' relinquishing of all rights, claims, and interests in the sea-diamond project and Lease 3C and for releasing Schlumberger from all causes of action, known or unknown. The Swansons signed the release, which also warranted that the Swansons were not relying on any statement or representation made by any agent of Schlumberger or Sedco. Schlumberger then sold its interest in the consortium to British Petroleum and DeBeers for ten million rand.[1]

The Swansons sued Schlumberger in 1992 alleging, inter alia, common-law fraud, and a breach of fiduciary duty. A claim of statutory fraud was added in 1993. The jury charge made inquiries regarding five theories of liability, including breach of fiduciary duties arising from a partnership, breach of fiduciary duties arising from a special relationship, common-law fraud by misrepresentation, common-law fraud by nondisclosure, and statutory fraud under Section 27.01 of the Texas Business and Commerce Code. Additionally, five questions were submitted on limitations, sixteen questions were submitted on other affirmative defenses, and two questions were submitted on Schlumberger's

counterclaim for breach of the release. The jury found in favor of the Swansons on all theories of liability and against Schlumberger on all affirmative defenses, as well as on the counterclaim. The jury found the value of the Swansons' interest in the sea-diamond project at the time of the release to be $15 million. The jury also awarded $35 million in exemplary damages on the statutory fraud claim, $10 million in exemplary damages on the breach of fiduciary duty and the common-law fraud claims, and an attorney's fee of twenty-five percent of the total recovery. The trial court granted Schlumberger's motion for j.n.o.v. and entered a take-nothing judgment in its favor. The judgment does not disclose the trial court's grounds for awarding the j.n.o.v.

## STANDARDS OF REVIEW

In reviewing a judgment notwithstanding the verdict, the court must view the evidence admitted at trial in favor of the nonmovant and determine that there was no evidence upon which the jury could have found for the nonmovant. *Exxon Corp. v. Quinn,* 726 S.W.2d 17 (Tex.1987). When the trial court states no reason why a j.n.o.v. was granted, and the motion for j.n.o.v. presents multiple grounds upon which a j.n.o.v. could be granted, the appellant has the burden of showing that the judgment cannot be sustained on any of the grounds stated in the motion. *Fort Bend County Drainage Dist. v. Sbrusch,* 818 S.W.2d 392 (Tex.1991).

Schlumberger's motion for j.n.o.v. was based upon the Swansons' failure to obtain any liability findings, the Swansons' failure to obtain an actual damage finding, the defense of ratification and limitation, and numerous allegations on legally insufficient evidence. In addition, Schlumberger has brought a cross-point on those issues challenging the sufficiency of the evidence legally and factually to support the jury's findings. Schlumberger also in cross-point objected to the

1. Of this ten million rand, 6.8 million rand went to Schlumberger as reimbursement for the investment in the development of the lease plus interest, and the other 3.2 million rand was split as profit between John Swanson, George Swanson, and Schlumberger. This is where the 2 million rand paid to the Swansons in exchange for their signing the release derived from. Three years later, the Swansons learned that DeBeers was nearing the commencement of commercial mining off the coast of South Africa.

court's submission of Jury Question 11 regarding fraudulent nondisclosure; to Jury Questions 4 and 5 regarding a relationship with special trust and confidence (because no pleading supported this submission and that there was no relationship of special trust and confidence as a matter of law); to Jury Question 22 concerning the value of the Swansons' interest; and to Jury Question 27 regarding contingency attorney's fees based upon a percentage of the recovery.

Because the standard for reviewing a j.n.o.v. is basically a no evidence standard, we shall review the j.n.o.v. and the no evidence points together, and then we shall review the sufficiency points in the same section.

■■■ When both no evidence and insufficient evidence points are raised, the court of appeals should rule upon the no evidence point first. *Glover v. Texas Gen. Indem. Co.*, 619 S.W.2d 400 (Tex.1981). In reviewing a no evidence point, a court must consider the evidence and inferences in a light tending to support the finding and disregard all contrary evidence and inferences. *Weirich v. Weirich*, 833 S.W.2d 942, 945 (Tex.1992). A no evidence point will only be sustained if there is a complete absence of, or no more

than a scintilla of evidence to support the trial court's finding. *Freeman v. Texas Compensation Ins. Co.*, 603 S.W.2d 186, 191 (Tex.1980).

■■■ In reviewing a factual sufficiency challenge, we consider all the evidence in the record, including any evidence contrary to the judgment. *Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex.1989). A factual sufficiency point will only be sustained if the evidence is so weak as to render the finding unjust. *See In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951).

## THE RELEASE

One of the main points of contention between the parties is the effect of the release signed by the Swansons, which contained language relinquishing all claims, known or unknown, against Schlumberger and further states that the Swansons contend that this release does not bar their causes of action because they allege fraud and a breach of fiduciary duty on the part of Schlumberger in convincing the Swansons to sign the release. Schlumberger contends that the release expressly rejects the possibility of fraud in the inducement.[2]

2. The pertinent language appearing in the Release In Full of Claims is as follows:

Therefore, we each, in consideration of the total sum of Two Million South African Rand, payable to all of us jointly and not individually, receipt of which is hereby acknowledged and confessed, do hereby release, acquit and forever discharge, and by these presents do for ourselves, our heirs, executors, legal representatives, administrators, successors and assigns, release, acquit and forever discharge Sedco Forex, Sedswan, and their successor corporations, affiliated corporations, their employees, representatives, successors, insurers and assigns, and all other persons, firms or corporations who might be liable from any and all claims, demands, charges, costs of court (including but not limited to attorney's fees), and causes of action of whatsoever nature, or any other legal theory arising out of the circumstances described above, from any and all liability damages of any kind known or unknown, whether in contract or in tort, property damages and any other damages which have accrued or may ever accrue to us, our heirs, executors, legal representatives, administrators, successors or assigns, for or on account of the facts and subject matter referred to above.

The aforementioned consideration is accepted jointly by all and each of us in full satisfaction of all damages or claims owed to any or all of us or that may be owed to any or all of us by Sedco Forex, Sedswan or their successor or affiliated corporations. It is further understood that this is a compromise and settlement of all matters alleged by any or all of us, including but not limited to those referred to above.

It is further understood and agreed that there are no promises of any additional payments or of any further benefits to be received by any or all of us, other than the consideration herein recited.

It is further understood and agreed that in making the settlement, our acceptance of the consideration herein stated is in full accord and satisfaction of disputed claims of any or all of us. The payment of the sums of money is not now, nor at any time in the future, to be construed as an admission of liability or guilt by Sedco Forex, Sedswan or person or entity, all of which has been expressly denied and would be vigorously contested in any action.

....

...[E]ach of us expressly warrants and represents ... that no promise or agreement which is not herein expressed has been made to him or her in executing this release, and

■ Proof of fraud is generally not prevented in the United States by a denial that any statements not in the instrument have been made and, if made, had been relied upon.[3] Texas law is no exception to the general rule. Under Texas law, a release is a contract and is subject to avoidance on grounds such as fraud or mistake, just like any other contract. *Williams v. Glash*, 789 S.W.2d 261 (Tex.1990).

■ When fraud induces the execution of a release, the release is voidable even though it contains a statement that no representations induced its making and that no promises not expressed therein were made, and the parties signing the release read it and knew. its contents. *Texas & P. Ry. Co. v. Presley*, 137 Tex. 232, 152 S.W.2d 1105 (1941); *see also Voskamp v. Arnoldy*, 749 S.W.2d 113 (Tex.App.–Houston [1st Dist.] 1987, writ denied); *Page v. Baldon*, 437 S.W.2d 625, 629 (Tex.Civ.App.–Dallas 1969, writ ref'd n.r.e.).

■ Schlumberger complains that if Swanson is allowed to go behind this release, in spite of the language of no reliance and a settlement of all claims known and unknown, then there can be no way that such a release could be drawn to avoid claims of fraud. Schlumberger is correct. If a party can overcome the language in an instrument of no reliance and settlement by convincing the jury that the instrument was tainted by the fraud, then the defrauded party can go behind the instrument.

The case of *Dallas Farm Machinery Co. v. Reaves*, 158 Tex. 1, 307 S.W.2d 233 (1957), wherein the court stated that a written contract containing a merger clause, or clause disclaiming responsibility for an agent's representations, can be avoided for fraud in its inducement and the parol evidence rule does not stand in the way of proof offered to show the fraud. *See also Presley*, 152 S.W.2d at

1107 (voiding a release for fraud in its inducement even though the release stated that the plaintiff relied wholly on his own judgment, that no representations by the defendants had influenced him, and that no promises had been made to him).

Schlumberger attempts to distinguish *Reaves* on its facts. *Reaves* dealt with a contract for the purchase of a tractor and did not involve the kind of extended negotiations as occurred in the present case; furthermore, the plaintiff in *Reaves* was not represented by counsel in the negotiations as the Swansons were in the present case.

Schlumberger contends that the Supreme Court overruled *Reaves* sub silentio in *Hobbs Trailers v. J.T. Arnett Grain Co.*, 560 S.W.2d 85, 87 (Tex.1977) (reversing 540 S.W.2d 441 (Tex.Civ.App.–Waco 1976)). A reading of the Waco Court of Appeals case of *Hobbs* indicates that the claim did involve fraud in the inducement; however, the Supreme Court in its *Hobbs* opinion did not mention any claim of fraud in the inducement. This case is an anomaly. There is a line of cases before and after the *Hobbs* case that hold that the parol evidence and the doctrine of merger are not bars to claims for fraud, accident, or mistake. *See Santos v. Mid–Continent Refrigerator Co.*, 471 S.W.2d 568 (Tex.1971); *Commercial Bank, Uninc., of Mason v. Satterwhite*, 413 S.W.2d 905, 909 (Tex.1967).

■ Schlumberger's contention is that the ruling in *Hobbs* is based upon the Supreme Court enforcing the law of merger and the parol evidence rule to deny evidence of fraud. In so doing, the Supreme Court did not mention any claim of fraud in the inducement. If this was the Supreme Court's purpose, it also overruled many other Supreme Court and Courts of Appeals cases without saying so. For example, the Supreme Court in *Santos* determined that fraud was an exception to the parol evidence

---

that none of us is relying upon any statement or representation of any agent of the parties being released hereby. Each of us is relying on his or her own judgment and each has been represented by Hubert Johnson as legal counsel in this matter. The aforesaid legal counsel has read and explained to each of us the entire contents of this Release in Full, as well as the

legal consequences of this Release, and we each understand that this Release in Full shall operate as a full and complete and final release and settlement of any and all claims referred to above.

**3.** *See* Warren A. Seavey, *Caveat Emptor as of 1960*, 38 Tex.L.Rev. 439, 448 (1960).

rule. 471 S.W.2d 568. The doctrine of merger has been held not to bar claims of fraud, accident, or mistake. *See Satterwhite*, 413 S.W.2d at 909. Many cases that have come after *Hobbs* have cited the case, but we have found none where the court believes that it excluded fraud as an exception to the parol evidence rule. *See, e.g., Bifano v. Young*, 665 S.W.2d 536, 541 (Tex.App.–Corpus Christi 1983, writ ref'd n.r.e.); *Pan American Bank of Brownsville v. Nowland*, 650 S.W.2d 879, 884–85 (Tex.App.–San Antonio 1983, writ ref'd n.r.e.); *Trans–American Van Service, Inc. v. Shirzad*, 596 S.W.2d 587 (Tex.Civ.App.–Houston [1st Dist.] 1980, no writ); *Neuhaus v. Kain*, 557 S.W.2d 125, 132 (Tex.Civ.App.–Corpus Christi 1977, writ ref'd n.r.e.); *see Town North National Bank v. Broaddus*, 569 S.W.2d 489, 491 (Tex.1978); *Tidelands Life Ins. Co. v. Harris*, 675 S.W.2d 224 (Tex.App.–Corpus Christi 1984, writ ref'd n.r.e.); *Harry Brown, Inc. v. McBryde*, 622 S.W.2d 596 (Tex.App.–Tyler 1981, no writ).

■ Schlumberger contends that because the Swansons were represented by counsel who also signed the agreement, their fraudulent inducement claims are undercut, citing *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 527 (2d Cir.1985). As this Court said in *Lutheran Brotherhood v. Kidder Peabody & Co.*, the degree of the investor's sophistication is evidence for the trier of fact to consider in deciding the issue of reasonable or justifiable reliance in an investment. 829 S.W.2d 300 (Tex.App.–Texarkana 1992), *judgment set aside without reference to the merits*, 840 S.W.2d 384 (Tex.1992). But the sophistication and experience does not preclude their recovery for fraudulent representations. This may certainly be a factor considered by the fact finder in determining whether there was fraud in the inducement and whether there was reliance upon it.

■ We conclude that the language in the contract relinquishing all rights and claims, known and unknown, against Schlumberger and the language stating that the Swansons were not relying upon representations made by Schlumberger would not preclude the submission and finding by the jury that there was fraud in the inducement.

## FRAUD BY MISREPRESENTATION

■ We next address whether there was legally and factually sufficient evidence to support the jury's finding of common-law fraud by misrepresentation. To recover for fraud, the Swansons must have proven: (1) that a material representation was made; (2) that it was false; (3) that the speaker knew it was false when made or that the speaker made it recklessly without any knowledge of the truth and as a positive assertion; (4) that he made it with the intention it be acted upon by the other parties; (5) that the party acted in reliance upon it; and (6) that the party was damaged. *See T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218 (Tex.1992).

The Swansons testified that Schlumberger misrepresented the commercial and technological feasibility of mining sea diamonds, the value of the project, and the fairness of the price paid for the Swansons' interest.

The Swansons presented testimony from John Swanson, Hubert Johnson, the attorney representing the Swansons in the negotiation of the release, several officials from Sedco and Schlumberger, and an expert on mining technologies to show that from February 1987 to March 1988 Schlumberger made numerous inaccurate representations to the Swansons regarding the commercial feasibility of the sea-diamond project. In April 1987, Blake Redding, Schlumberger's general counsel in charge of negotiations with the Swansons, told John Swanson that there was no technology to exploit the offshore mining opportunities in South Africa. Billy Smith, the manager of the sea-diamond project for Schlumberger admitted telling the Swansons that the technology did not exist to mine the diamonds. But Dillard Hammett, the Sedco vice-president in charge of ocean mining, testified that Sedco had mined silver and manganese nodules off the floor of the ocean at depths much greater than the diamond field off the coast of South Africa. Dr. William van Rensberg and another expert testified that the technology was available well before 1987 to mine diamonds off the ocean floor. Dr. van Rensberg further testified that the technology currently being utilized by De-Beers to mine diamonds from a tract adja-

cent to that at issue here was available in 1987 and, in fact, was present in South Africa at that time.

John Swanson testified that agents of Schlumberger represented to him that the mining of the sea diamonds would be prohibitively expensive and that the project was not an attractive business proposition. Dr. van Rensberg testified that the sea-diamond project was commercially viable. John Swanson and Hubert Johnson also testified that Schlumberger attempted to lend credibility to its representations by attributing them to other parties, but two of these supposed sources, John Claude Serre and Kenneth Lane, each testified at trial that they had not made such statements to Schlumberger.

John Swanson further testified that Schlumberger made promises in two telephone calls during February 1987 that Schlumberger would hire an appraiser to place a value on the sea-diamond project to assure that the Swansons would be paid a fair price for their interests. Schlumberger later represented to the Swansons that the $814,000.80 paid in exchange for the signing of the release was a fair price for the Swansons' interest. Dr. van Rensberg testified that at the time of the signing of the release, the price paid to the Swansons was a very unfair price for their interest. The Swansons contend that Schlumberger's promise to investigate the sea-diamond project and offer the Swansons a fair price for their interest was a false promise made with no intention to perform and therefore was fraudulent. *See T.O. Stanley Boot Co.,* 847 S.W.2d at 222. The Swansons contend that Schlumberger's lack of intent to perform was shown by the fact that Schlumberger was informed in June 1986, months before it made the promise to the Swansons, that it could not receive a fair price from DeBeers under the terms of the consortium agreement.

■ The Swansons additionally contend that Schlumberger was in a vastly superior position to evaluate the commercial viability of the project and, because of the terms of the consortium agreement, which obligated the parties to refrain from sharing data on the diamond fields with anyone outside of the consortium, the Swansons became entirely dependent upon Schlumberger for information regarding the sea-diamond project. Even though the representations made by Schlumberger may be characterized as opinions as to the commercial viability of the project, such opinions are actionable when the maker of the representation had special knowledge of the subject matter and when the opinions were based on facts. *Trenholm v. Ratcliff,* 646 S.W.2d 927, 930 (Tex.1983). There was legally and factually sufficient evidence to show that material representations were made and that they were false.

■ The third element in proving fraud by misrepresentation is whether the speaker knew the statements were false when made or that the speaker made the statements recklessly without any knowledge of the truth and as a positive assertion. *See T.O. Stanley Boot Co.,* 847 S.W.2d 218. The evidence demonstrates that Schlumberger was fully aware of all of the information on which Dr. van Rensberg based his analysis.

Hammett, the vice-president of Sedco in charge of ocean mining, testified that Sedco would have commenced mining the diamonds if Schlumberger had not bought the company. He also testified that Sedco arrived at this decision after a long period of study in which it concluded that the technology existed in 1986 to mine the diamonds commercially and that the project was commercially viable. After Hammett concluded his study of the project and Schlumberger took over Sedco, no additional studies were undertaken and no adverse developments arose to refute the conclusions of Hammett's study. Smith, the manager of the project under Schlumberger, admitted that prospects for the sea-diamond project did not worsen after Hammett left the operation.

Schlumberger authored a position paper in February 1988 in which it stated that the correct way to find a fair price for the sea-diamond project was to find a reasonable net present value for future prospecting and mining operations. Dr. van Rensberg utilized this method of analysis in coming to his conclusion that the project was economical and that the Swansons were not paid a fair price.

The Swansons next contend that even if Schlumberger did not know that the representations were false, it would be liable for fraud, nonetheless, if it made the representations recklessly, i.e., without sufficient information to support them. Other than the study by Hammett, Schlumberger did not study the technological feasibility of the diamond mine.

■ The Swansons must also demonstrate that they acted in reliance upon the misrepresentations made by Schlumberger. *T.O. Stanley Boot Co.*, 847 S.W.2d 218. John Swanson testified that he and his brother trusted Schlumberger and relied on its representations in signing the release. The Swansons' attorney, Hubert Johnson, testified that he told the Swansons that Schlumberger's counsel, Blake Redding, was honest. Johnson also testified that he did not think the Swansons would have signed the release if they still believed that the project was viable. John Swanson testified that the Swansons relied on Schlumberger's representations regarding the lack of technology to mine the diamonds, the commercial viability of the project, and the value of the Swansons' interest in the enterprise.

■ Schlumberger contends that the Swansons failed to prove that they relied on the representations made by Schlumberger regarding the sea-diamond project. A settlement will not be set aside on the ground of legal fraud if an element of fraud is missing. *Alvarez v. Employers' Fire Ins. Co.*, 531 S.W.2d 218, 221 (Tex.Civ.App.–Amarillo 1975, no writ). Schlumberger again points to the release wherein the Swansons warranted that they were not relying upon any statement or representation made by any agent of Schlumberger and that they were relying on their own judgment.

Schlumberger contends that the evidence is factually insufficient to support the Swansons' reliance upon representations made by Schlumberger. In addition to the language in the release declaring that there was no reliance, Schlumberger cites John Swanson's testimony that he believed at the time he signed the release that Schlumberger had withheld material information, that Schlumberger had breached its fiduciary duty to the Swansons, that Schlumberger had been negligent, that Schlumberger had repeatedly lied to the Swansons, and that Schlumberger had breached its trust.

The Swansons countered this argument by pointing to evidence that they trusted and believed the statements made by Redding, that they relied upon Schlumberger's representation that there was no technology for mining the diamonds, that they relied upon representations that the project was not commercially feasible, that they relied upon Schlumberger's promise to offer them a fair price for their interest, and that their attorney testified that the Swansons would not have signed the release if they had still believed that the project was viable. The evidence certainly reflects that John Swanson had some mistrust of Schlumberger at the time the release was filed, but the main thrust of the reliance was specifically on whether there was technology in existence that made it commercially feasible to mine the diamonds. There was evidence on both sides of the reliance issue; thus, this was a factual decision to be made by the jury. *See Goodrich v. Pandem Oil Corp.*, 48 S.W.2d 606, 608 (Tex.Comm'n App.1932, judgm't adopted). We find that the evidence was legally and factually sufficient to support the jury's finding on reliance. These points of error are overruled.

For support under its factual sufficiency challenge to the evidence, Schlumberger cites to John Swanson's testimony wherein he stated that at the time he signed the release he believed that Schlumberger had withheld material information, that it had breached a fiduciary duty, that Schlumberger had breached a trust, that Schlumberger had conspired with DeBeers or with DeBeers and British Petroleum, that Schlumberger had lied to the Swansons regarding their interest in the diamond project, and that the determination of fair price under the consortium agreement was unfair. Schlumberger contends that this testimony refutes the Swansons' contention that they relied on the representations made by Schlumberger.

## FRAUD BY NONDISCLOSURE

We next examine whether the evidence was legally and factually sufficient to support

the jury's finding of fraud by nondisclosure. Hammett, the vice-president of Sedco in charge of ocean mining, and Smith, the manager of the sea-diamond project for Schlumberger, both admitted that they had withheld material information from the Swansons. Hammett also said that the Swansons were given no details of the technical aspects of the operation and that he was acting on orders from Schlumberger management to withhold information from the Swansons. John Swanson testified that Schlumberger *did not give the Swansons any of the diamond prospecting reports after March 1986* and that Schlumberger did not disclose the offer to sell to DeBeers, nor did Schlumberger give the Swansons a copy of its position paper, discussed above, which detailed Schlumberger's chosen method for deriving a fair price for the sea-diamond project. Smith further testified that employees of Schlumberger thought that they knew more about the prospecting information than the Swansons did. The Swansons contend that had Schlumberger not withheld the information regarding the project, they could have independently evaluated their interests rather than relying on Schlumberger.

■■■ Schlumberger again relies on the release in its recital that the Swansons relied solely on their own judgment and on the advice of their attorney. The failure to disclose information is not fraudulent unless one has an affirmative duty to disclose, such as where a confidential or fiduciary relationship exists between the parties, or where a party later learns that previous affirmative representations are in fact false. *Tempo Tamers, Inc. v. Crow–Houston Four, Ltd.,* 715 S.W.2d 658 (Tex.App.–Dallas 1986, writ ref'd n.r.e.).

■■■ The fraudulent nondisclosure jury question in the present case was taken from 4 STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES PJC 105.03 (1990), which was taken from the charge approved in *New Process Steel Corp. v. Steel Corp. of Texas,* 703 S.W.2d 209, 214 (Tex.App.–Houston [1st Dist.] 1985, writ ref'd n.r.e.), in which the court held that a duty to disclose arises if the

defendant makes a partial disclosure which is not the whole truth or if the defendant knows that the victim is ignorant of a material fact and does not have an equal opportunity to discover it. *See also, Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 435 (Tex.1986); *Ralston Purina Co. v. McKendrick,* 850 S.W.2d 629, 635 (Tex.App.–San Antonio 1993, writ denied); *State National Bank v. Farah Manufacturing Co.,* 678 S.W.2d 661, 681 (Tex.App.–El Paso 1984, writ dism'd by agr.).

We find the evidence was legally and factually sufficient to support the finding of fraud by nondisclosure. Whether Schlumberger had a duty to disclose as a fiduciary will be discussed in another section and will not be considered a part of the court's ruling on this point. Otherwise, these points of error are overruled.

## STATUTORY FRAUD

■■ Section 27.01 of the Texas Business and Commerce Code creates a cause of action for fraud in a transaction involving real estate or stock in a corporation or joint stock company. TEX.BUS. & COM.CODE ANN. § 27.01 (Vernon 1987). The elements of statutory fraud are essentially the same as those for fraud by misrepresentation, except that knowledge of falsity is not a prerequisite for recovery of actual damages. The details of the evidence introduced to prove or disprove misrepresentations by Schlumberger, therefore, will not be retraced here.

The parties' sole dispute on this issue revolves around whether Texas law or the law of South Africa should govern the applicability of Section 27.01. This question is dispositive of this issue because mineral interests are not treated as real estate in South Africa.[4]

■■■ The Swansons first contend that because the parties stipulated that Texas law governs the construction and foreseeability of the release, Texas law also governs any claim for fraudulently inducing the contract. *See Tel–Phonic Services, Inc. v. TBS International, Inc.,* 975 F.2d 1134, 1142 (5th Cir.

---

*4.* Johan Roodt, an expert on South African law, stated in his deposition that a prospecting lease

is a "personal right" and not a "real right."

1992) (applying Texas choice of law rules). The Swansons further contend that, notwithstanding the stipulation, Texas law governs under the "most significant relationship test" set forth in RESTATEMENT (SECOND) OF CONFLICT OF LAWS, as adopted for use in Texas by the Texas Supreme Court in *Gutierrez v. Collins,* 583 S.W.2d 312, 318 (Tex.1979). *See also Wall v. Noble,* 705 S.W.2d 727, 733 (Tex.App.–Texarkana 1986, writ ref'd n.r.e.). In *Gutierrez,* the Texas Supreme Court held that application of the most significant relationship analysis should not turn on the number of contacts but on the qualitative nature of those contacts. *Gutierrez,* 583 S.W.2d at 319. Comment e of Section 6 of the Restatement states:

> If the purposes sought to be achieved by a local statute or common law rule would be furthered by its application to out-of-state facts, this is a weighty reason why such application should be made.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6 cmt. e (1971); *see also Total Oilfield Services, Inc. v. Garcia,* 711 S.W.2d 237 (Tex. 1986) (Texas Wrongful Death Act applied to permit recovery of punitive damages which would have been barred under the law of the place of the death). The Swansons contend that Texas has a strong state interest in deterring fraud from occurring within its borders and in protecting and compensating its citizens who have been the victims of fraud. The State has the right and the power to punish conduct occurring outside its borders when the conduct was intended to produce and did in fact produce some substantial effect within its borders. *See Hartford Fire Ins. Co. v. California,* 509 U.S. ——, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993). Section 148(2) of the Restatement explains that when the plaintiff's action in reliance on the misrepresentations took place in whole or in part in a place other than where the false representations were made, the forum should consider the following factors in determining the state which has the most significant relationship to the occurrence and the parties: the place or places where the plaintiff acted in reliance upon the representations, the place where the plaintiff received the representations, the place where the defendant made the representations, the residence or place of incorporation of the parties, and the place where a tangible thing which is the subject of the transaction between the parties was situated at the time. RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 148(2) (1971).

■ All three of the letter agreements between the Swansons and Sedco were negotiated, drafted, and executed in Texas; Schlumberger is authorized to do business in Texas, and Ian Strecker, executive vice-president of Schlumberger, managed the sea-diamond project from the Schlumberger office in Houston. The misrepresentations were received by John Swanson in Texas. The misrepresentations occurred in a series of telephone calls made from Paris, France to Dallas, Texas, in a meeting at the Schlumberger offices in Dallas and in a telephone call made from South Africa to the Swansons' attorney in Dallas; and all the negotiations relating to the signing of the release took place in Texas and involved Blake Redding, Schlumberger's counsel, Hubert Johnson, the Swansons' counsel, and John Swanson, who were citizens of Texas at that time. John Swanson's act of reliance upon the misrepresentations in this case was the signing of the release, and this too occurred in Dallas.

Schlumberger relies on the case *Hunt v. Coastal States Gas Producing Co.,* 583 S.W.2d 322, 325 (Tex.1979), *cert. denied,* 444 U.S. 992, 100 S.Ct. 523, 62 L.Ed.2d 421 (1979), in which the court held that Libyan substantive law should govern the question of whether an interest in an oil concession was a contract or a real property right because Libya was the place of the contract's execution and performance as well as the location of the subject matter. *Hunt* is distinguishable from the present case because it involved a contract that expressly incorporated Libyan law. Furthermore, the case did not involve a Texas statute, and the execution of the release at issue in the present case occurred in Texas. Based upon the evidence, Texas has the most significant relationship to the issues,[5] and Texas law should be applied.

---

5. Schlumberger also contends that the legislative intent behind the enactment of Section 27.01 of

## BREACH OF FIDUCIARY DUTY

The Swansons also correctly contend that a release could not destroy any fiduciary duty to them because an agreement by a fiduciary to exclude all fiduciary responsibility is against public policy. *See Maykus v. First City Realty and Financial Corp.*, 518 S.W.2d 887, 893–94 (Tex.Civ.App.–Dallas 1974, no writ).

The jury found breach of fiduciary duty based on two independent theories: partnership and the existence of a special relationship. Schlumberger challenges the sufficiency of the evidence to support the jury's findings on fiduciary relations.

Schlumberger also contends that the Swansons did not show proximate causation of damages from any breach of fiduciary duty because the charge defined proximate causation as requiring foreseeability. Schlumberger contends there could be no foreseeability because of the Swansons warranting that they were not relying on any information from Schlumberger. The time for foreseeability was the time that Schlumberger made misrepresentations. At that time, Schlumberger could have foreseen that the Swansons would rely upon its expertise that mining of the diamonds in the ocean was not feasible and that, relying upon such representations, the Swansons would believe that their rights to such mining was of little value. The proximate causation argument is therefore overruled. We now proceed to discuss the sufficiency of the evidence under the two fiduciary findings.

### Partnership

A partnership is an association of two or more persons to carry on as co-owners a business for profit. Tex.Rev.Civ. Stat.Ann. art. 6132b, § 6(1) (Vernon 1970). Question 11 in the jury charge instructed the jury that in order to find a partnership agreement, they must find from a preponderance of the evidence each of the following elements: (1) that there was a community of interest in the project/enterprise; (2) that there was an agreement to share profit; (3) that there was an agreement to share losses; and (4) that there was a mutual right of control or management of the project/enterprise. The jury charge therefore instructed the jury on the common-law elements of partnership which many courts continue to use even after the passage of the Partnership Act. *See, e.g., Tex–Co Grain Co. v. Happy Wheat Growers, Inc.*, 542 S.W.2d 934, 937 (Tex.Civ.App.–Amarillo 1976, no writ). The sufficiency of the evidence must be measured under the instructions in the trial court's charge as submitted. *See Sage Street Associates v. Northdale Constr. Co.*, 863 S.W.2d 438, 447 (Tex.1993). Whether a particular relationship constitutes a partnership depends on the parties' intent, and each case must be evaluated according to its own circumstances. *Adams v. Petrade International, Inc.*, 754 S.W.2d 696 (Tex.App.–Houston [1st Dist.] 1988, writ denied).

There was general evidence of a partnership and a community of interest. The parties agreed to "jointly undertake to recover and market diamonds from … offshore the coast of Namibia and/or South Africa." Both of the men who negotiated the original letter agreements, John Swanson and Dillard Hammett, testified that the relationship created by the agreements was one of partnership. In seeking the mineral lease from the South African government, Sedco represented that there was a partnership and, in fact, the lease was awarded to Sedco and George Swanson Enterprises as a partnership. *See Romer v. Gruver State Bank*, 474 S.W.2d 578, 579 (Tex.Civ.App.–Eastland 1971, no writ) (execution of written instrument acknowledging a partnership is some evidence of partnership). Dillard Hammett further testified that he told both British

the Texas Business and Commerce Code was to prevent fraudulent land schemes in Texas, citing Tex.H.B. 3, 36 Leg., p. 77, c. 43 (1919). The Swansons reply that Section 27.01 is not intended to protect land, but is intended to protect people from fraud involving land. Several Texas courts have applied Section 27.01 to out-of-state land, but in none of these cases did any of the

parties raise an issue regarding the applicability of Section 27.01 on the basis that the land was not in the state. *See, e.g., Berquist v. Onisiforou*, 731 S.W.2d 577 (Tex.App.–Houston [14th Dist.] 1987, no writ) (Utah coal royalties); *Maddox v. Worsham*, 415 S.W.2d 222 (Tex.Civ.App.–Amarillo 1967, writ ref'd n.r.e.) (New Mexico ranch).

Petroleum and Schlumberger that Sedco was involved in a partnership with the Swansons. Ian Strecker, executive vice-president of Schlumberger, admitted that a partnership existed.

▇▇ There was evidence of an agreement to share profits of the enterprise. Under the terms of the written agreement, the proceeds from the sale of any diamonds recovered during Phase II of the operation were to be distributed ninety percent to Sedco and five percent to John Swanson and five percent to George Swanson Enterprise, Ltd. In the case of *Patton v. Callaway*, the court held that the sharing of profits and override of royalty, standing alone, did not constitute a joint venture. 522 S.W.2d 252, 256 (Tex.Civ. App.–El Paso 1975, writ re'f n.r.e.). In the case of *Jenkins v. Brodnax White Truck Co.*, the court held that to constitute a partnership the parties to a transaction must be entitled to share in the net profits. 437 S.W.2d 922 (Tex.Civ.App.–Tyler 1969, no writ). It is not sufficient that they participate in gross profits. In the commercial phase of the agreement, Swanson Enterprises and J.D. Swanson were to receive a royalty equivalent to 2.5 of the net proceeds. The net proceeds were to be calculated after royalties had been paid to any government or concession owner. In 1988, when the relationship between the parties ended, the profit from the sale of the assets of the alleged partnership was split three ways among John Swanson, George Swanson Enterprises, and Schlumberger. Under the Texas Partnership Act, the receipt of a share of the profits of a business is prima facie evidence that a person is a partner in the business. See TEX.REV.CIV.STAT.ANN. art. 6132b, § 7(4) (Vernon 1970). Schlumberger insists that it merely elected to pay proceeds received from the sale of its consortium interest as a source of payment of funds due to the Swansons under the release and was not obligated to share the proceeds with the Swansons. Whether Schlumberger shared the proceeds in accordance with the terms of an express or implied agreement or for some other reason,

was a question of fact for the jury to decide. The agreement may be implied by the acts and declarations of the parties. *First National Bank v. Chambers*, 398 S.W.2d 313 (Tex.Civ.App.–Eastland 1965).

▇▇ There was evidence that both parties agreed to be responsible for some of the expenses of the venture. John Swanson testified that both parties intended there to be a sharing of losses, that in the mining phase of the project the Swansons would own ten percent of the equity in the newly formed mining company and therefore would be responsible for ten percent of the operating costs. However, an agreement to share profits in a yet-to-be-formed business is no evidence of a partnership. *Root v. Tomberlin*, 36 S.W.2d 596, 601 (Tex.Civ.App.–El Paso 1931, writ ref'd).

▇▇ John Swanson admitted in his testimony that losses occurring to Sedco from project operations did not create an obligation on the part of Swanson to reimburse Sedco, nor did Swanson believe that, if Sedco filed bankruptcy, creditors could pursue the Swansons for debts owed on the sea-diamond project. Sedco agreed to undertake, at its sole expense, a feasibility study and Sedco agreed to pay all costs and expenses related to Phase II of the operations. The Swansons agreed to bear the expenses during the prospecting phase of the project in that they used their own funds in lobbying the South African government for an offshore mineral lease. The bearing of expenses constitutes some evidence of the sharing of losses. *McCulley Fine Arts Gallery v. X Partners*, 860 S.W.2d 473, 479 (Tex.App.–El Paso 1993, no writ).[6]

There was evidence to demonstrate mutual control over the project. The Swansons were to provide consulting services for obtaining concession agreements and exclusive operating rights, in obtaining government licenses, and permits, as well as other areas. However, Swanson was to be paid for his consulting services. The parties agreed that

6. *But see Hasslocher v. Heger*, 670 S.W.2d 689 (Tex.App.–San Antonio 1984, writ ref'd n.r.e.) (the court found that there was no agreement to share losses where the written agreement contained no provision that the parties would share losses and both parties testified that they expected the expenses to be reimbursed from the profits).

neither of them would undertake the mining of diamonds in Namibia or South Africa, except in association with the other party. George Swanson was initially designated one of the three directors of the entity called Sedco/Swanson. Sedco had an obligation and did in fact consult with the Swansons, and there was testimony that the Swansons had control over the marketing of any diamonds.

The evidence was legally and factually sufficient to satisfy the requirements of the Texas Partnership Act and also the terms of the trial court's charge.

### Special Relationship

Schlumberger contends that because the Swansons failed to plead a special relationship, the trial court correctly set aside that jury finding. The judgment of the court must conform to the pleadings. TEX.R.CIV.P. 301. Pleadings must be sufficient to give the opposing party notice of the cause of action being alleged. *Stone v. Lawyers Title Ins. Corp.*, 554 S.W.2d 183, 186 (Tex.1977).

The Swansons contend that the pleadings were sufficient to give Schlumberger notice of their intention to allege the existence of a special relationship. The pleadings included the allegation that "Schlumberger was a fiduciary of the Swansons, and the Swansons were completely dependent upon Schlumberger to protect and preserve their interests." Furthermore, the fact section of the Swansons' pleadings characterize the dealings of the parties as a trust relationship involving fiduciary duties. Pleadings are to be liberally construed. *Roark v. Allen*, 633 S.W.2d 804, 809 (Tex. 1982). Schlumberger recognized the Swansons' contention of a confidential relationship because in its motion for partial summary judgment, Schlumberger stated that: "The Swansons allege that a confidential relationship existed between the Swansons and Schlumberger [and] that they had come to place special trust and confidence in and to rely upon Schlumberger."

The trial court apparently believed that the Swansons' pleadings were sufficient without the trial amendment, because the trial court submitted a jury question specifically on that point. The pleadings are suffi-cient to raise an issue of fiduciary duties arising from a special relationship. The Swansons were not required to appeal the ruling of the trial court denying a trial amendment when the trial court, after ruling on that motion, allowed the Swansons to submit the issue to the jury.

Schlumberger next complains that Jury Question 4 improperly submitted a special relationship theory of recovery because it did not inquire into any relationship of special trust and confidence that existed prior to and apart from the three letter agreements and the release. Schlumberger did object to Question 4 on this basis, so if its argument is correct, the answer to Question 4 cannot be used to support a judgment in favor of the Swansons. *See Ramos v. Frito–Lay, Inc.*, 784 S.W.2d 667, 668 (Tex.1990) (a jury question which omits a required element cannot support a judgment on the verdict); *Atrium Boutique v. Dallas Market Center Co.*, 696 S.W.2d 197 (Tex.App.–Dallas 1985, writ ref'd n.r.e.) (there must have been a previous relationship apart from the agreement made the basis of the suit, which placed the parties in a position of confidence and trust).

Jury Question 4 asked the jury: "Do you find from a preponderance of the evidence that after January 1987 and before October 26, 1988, Schlumberger and the Swansons had a relationship of special trust and confidence?" This jury question meets the requirement that the relationship must have existed prior to and apart from the agreement made the basis of the suit, which was the release signed by the Swansons on October 26, 1988.

Under Texas law, confidential relationships creating fiduciary duties may arise not only from the technical fiduciary relationships, such as that between partners, but may arise informally from moral, social, or purely personal relationships. *Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex.1962); *see also Scott v. Scruggs*, 836 S.W.2d 278, 282 (Tex.App.–Texarkana 1992, writ denied); *Consolidated Bearing v. First National Bank*, 720 S.W.2d 647 (Tex.App.–Amarillo 1986, no writ) (parties worked together for joint acquisition and development of land).

The existence of such relationships are not subject to hard-and-fast rules. *Lacy v. Ticor Title Ins. Co.,* 794 S.W.2d 781, 788 (Tex. App.–Dallas 1990), *writ denied per curiam,* 803 S.W.2d 265 (Tex.1991). Such relationships have been held to exist "whenever one party trusts and relies upon another." *Texas Bank and Trust Co. v. Moore,* 595 S.W.2d 502, 507 (Tex.1980).

The Swansons contend that the parties' intention to create a partnership in 1978, as evinced by the three letter agreements, is strong evidence that a special relationship existed in this case. In *Gaines v. Hamman,* 163 Tex. 618, 358 S.W.2d 557, 560 (1962), the Supreme Court found that a special relationship existed when two people jointly acquired and developed certain mineral properties over a four-year period, one provided geological prospecting work and one put up money and acquired the lease, and the parties split the royalties when the lease was sold. The court found a special relationship, even though the relationship may not have met the technical requirements of a partnership or joint venture, because there was no sharing of losses. *Id.* 358 S.W.2d at 560–61; *see also Maykus,* 518 S.W.2d at 892 (even if the parties were prospective joint venturers rather than present joint venturers or partners, the relationship was confidential with respect to matters undertaken in furtherance of the proposed venture).

■ In addition to the allegation of intended partnership, the Swansons suggest that the facts in this case contain elements similar to those required to form other fiduciary relationships. The Swansons maintain that Schlumberger acted as the Swansons' representative within the consortium, and they cite to the testimony of Billy Smith, Schlumberger's manager of the sea-diamond project, wherein he stated that he viewed himself as a representative of the Swansons in dealings involving the project. An agent owes a fiduciary duty to its principal. *State v. Durham,* 860 S.W.2d 63 (Tex.1993). The Swansons also contend that Schlumberger promised to hold property in trust for the Swansons' benefit when the offshore mineral lease was transferred into the name of Sedswan Diamonds, a Schlumberger South African subsidiary. Dillard Hammett testified that the lease was to be held by Sedswan for the benefit of both Schlumberger and the Swansons, and John Swanson testified that was his understanding as well. Trustees owe beneficiaries fiduciary duties. *See Thigpen,* 363 S.W.2d at 253.

■ Lastly, the Swansons contend that Schlumberger's position of superiority in the dealings between the parties and the Swansons' complete dependence upon Schlumberger for information and for protection of their interests created a relationship of special trust and confidence. A special relationship may exist as a matter of fact when one party has placed a special confidence in another so as to cause the parties to deal with each other on unequal terms, either because of the dominance of one or the weakness, dependence, or justifiable trust of the other. *Dodson v. Kung,* 717 S.W.2d 385 (Tex.App.–Houston [14th Dist.] 1986, writ ref'd n.r.e.). John Swanson testified that he trusted and relied upon Sedco and later on Schlumberger and that he was completely dependent on Schlumberger for information and for the protection of his interests. Billy Smith, Schlumberger's manager, testified that he felt that he had a duty to protect the Swansons' interests and to treat the Swansons' interests equal to that of Schlumberger's. Hammett, Sedco's vice-president, testified that, after Schlumberger took over the project, the Swansons were excluded from participation in the project and decisions regarding the project and that they were cut off from all information on the project. Lastly, the Swansons contend that Schlumberger owed them a fiduciary duty because Schlumberger held the executive rights to the minerals from which the Swansons were due a royalty. *See Manges v. Guerra,* 673 S.W.2d 180, 183 (Tex.1984).

■ We find that the evidence was legally and factually sufficient to support the jury's finding.

### RESULTING TRUST

The trial court refused to submit a jury question requested by the Swansons regarding the existence of fiduciary duties arising

from a resulting trust. On appeal, the Swansons contend that their consent to transfer title to the offshore mineral lease to Sedswan without consideration, without the intention to make a gift, and with the intention that Sedswan would hold the lease in trust for the Swansons, and Schlumberger's intention at the time of the transfer of the lease to hold title on behalf of both itself and the Swansons, establishes that a resulting trust occurred as a matter of law. Because our rulings on other points are dispositive of this case, we do not reach the issue of whether the evidence established a resulting trust.

## AFFIRMATIVE DEFENSES

The Schlumberger motion for j.n.o.v. alleged that two affirmative defenses had been established as a matter of law. These defenses alleged that the Swansons had ratified the release by retaining the benefits they received thereunder and that the Swansons' claims were barred by the statute of limitations. These defenses are discussed because, as previously set forth under Standards of Review, the Swansons had the burden to show that the j.n.o.v. could not be sustained upon any of the grounds set forth in the motion.

### Ratification of Release

■■■■■ Schlumberger contends that because the Swansons kept the money that they received in exchange for signing the release, they, in effect, ratified the release as a matter of law. Ratification occurs when one, induced by fraud to enter into a contract, continues to accept benefits under the contract after he becomes aware of the fraud or if he conducts himself in such a manner as to recognize the contract is binding; any retention of the beneficial part of the transaction affirms the contract and bars an action for rescission, as a matter of law. *Spellman v. American Universal Inv. Co.*, 687 S.W.2d 27 (Tex.App.–Corpus Christi 1984, writ ref'd n.r.e.). The defrauded party is not held responsible for tender of the benefits under the contract until he has become aware of the fraud. *Daniel v. Goesl*, 161 Tex. 490, 341 S.W.2d 892 (1960); *see also Guion v. Guion*, 475 S.W.2d 865 (Tex.Civ.App.–Dallas 1971, writ ref'd n.r.e.). To be entitled to the equi-

table remedy of rescission, the party must show either that he is not retaining the benefits without restoration to the other party or that there are special equitable considerations that obviate the need for the parties to be in the status quo. *Boyter v. MCR Construction Co.*, 673 S.W.2d 938, 941 (Tex.App.–Dallas 1984, writ ref'd n.r.e.).

■■■ The Swansons tendered the original consideration in their sixth amended petition and requested the court to award that consideration in the judgment. In *Pattison v. Highway Ins. Underwriters*, 278 S.W.2d 207, 212 (Tex.Civ.App.–Galveston 1955, writ ref'd n.r.e.), the case relied on by the Swansons, the court held that the fact that the plaintiffs pled a willingness to credit any sum that they might recover in the judgment with the sum that they had received as consideration for signing the release was sufficient tender because the plaintiffs also alleged that the sum received as consideration had been expended for necessaries, such as medical bills and attorney's fees. The Swansons allege that it would be impossible for the parties to return to the pre-release status quo because Schlumberger has sold the interest in the sea-diamond project which the Swansons waived in the lease.

The Swansons contend that they did not need to tender the actual consideration because they took the option of standing on the transaction and suing for damages as opposed to rescinding the transaction and seeking restitution of the rights and interest that they had given up. *See Burroughs Corp. v. Farmers Dairies*, 538 S.W.2d 809, 810 (Tex. Civ.App.–El Paso 1976, writ ref'd n.r.e.) (party injured by fraud may elect to accept situation and recover damages or repudiate the transaction and seek restoration of the status quo). *Texas Employers Ins. Association v. Kennedy*, 135 Tex. 486, 143 S.W.2d 583, 585 (1940).

Because the Swansons sued for the difference between what they were paid and what they should have paid, they need not have tendered the money prior to filing suit. In order to recover, a party must establish that he has a meritorious claim for compensation in an amount greater than that which he

received; he should not be required to make a tender.

■ At least two courts have held that the burden is on the defendant to prove that the plaintiff had knowledge of the fraud and to prove a voluntary, intentional choice to ratify the contract in light of that knowledge. *See Spangler v. Jones,* 797 S.W.2d 125, 131 (Tex.App.–Dallas 1990, writ denied); *Johnson v. Smith,* 697 S.W.2d 625, 630 (Tex.App.– Houston [14th Dist.] 1985, no writ). If the acts of ratification are controverted, the question becomes one for the trier of fact. *See Spangler,* 797 S.W.2d at 131; *Johnson,* 697 S.W.2d at 630–31; *Sawyer v. Pierce,* 580 S.W.2d 117, 123 (Tex.Civ.App.–Corpus Christi 1979, writ ref'd n.r.e.). John Swanson testified that the Swansons never had full knowledge of the fraud and that the money was not returned to Schlumberger because it was offered in the pleadings. In response to Jury Question 30, the jury found that the Swansons did not, in fact, ratify the release. The circumstances establish that the Swansons did not ratify the release.

## Statute of Limitations

■ Also in its motion for j.n.o.v., Schlumberger contended that the Swansons' claims were barred by the statute of limitations as a matter of law. In answer to several different jury questions, the jury found that the Swansons filed their lawsuit within four years of the date that they discovered, or should have discovered, conduct which formed the basis of the alleged causes of action. Schlumberger contended that the jury's findings on those questions were not supported by legally sufficient evidence. It then cites to numerous parts of the testimony of John Swanson wherein he admitted that he mistrusted Schlumberger, felt that Schlumberger had withheld material information, thought that Schlumberger had breached a fiduciary duty, considered Schlumberger negligent, believed that a conspiracy had taken place between DeBeers, Schlumberger, and British Petroleum, believed that Schlumberger had breached a trust, believed that the valuation of the Swansons' consortium interest was unfair and believed that Schlumberger had not treated them as partners. Schlumberger contends that this testimony establishes that Swanson knew about all of the facts which form the basis for each and every cause of action alleged by February 1987. The Swansons contend that because all of their damages flow from the date of the signing of the release, the date on which the misrepresentations, nondisclosures, and the breach of fiduciary duty on the part of Schlumberger, came to fruition, the limitations period could not have begun running before October 26, 1988, the date of the signing of the release. *See Atkins v. Crosland,* 417 S.W.2d 150, 153 (Tex.1967) (cause of action accrues when it becomes a legal injury to plaintiff, i.e., a completed wrong); *see also Jeanes v. Hamby,* 685 S.W.2d 695, 699–700 (Tex.App.–Dallas 1984, writ ref'd n.r.e.). The issue of discovery of the cause of action is a fact question for the jury because there was no conclusive evidence demonstrating that the Swansons knew or had available to them the information regarding the misrepresentations and nondisclosures made by Schlumberger prior to 1991.

## DAMAGES

Schlumberger contends that the questions submitted to the jury only support the setting aside of the release and do not support a recovery of damages. A review of the jury charge reveals that each of the questions alleging wrongful conduct on the part of Schlumberger was addressed solely to whether that wrongful conduct induced the execution of the release. The Swansons do not refute this. In fact, they specifically contend that the signing of the release itself caused their damages, because, up to the time that they signed the release, they still possessed the interest that they now seek compensation for. In short, had there been no release, there would have been no damages.

Schlumberger contends that a plaintiff may not recover money damages solely from wrongful execution of a release but instead, the plaintiff must also obtain favorable findings on the claims that the release was purported to waive, citing *Premeaux v. Socony– Vacuum Oil Co.,* 144 Tex. 558, 192 S.W.2d

138, 142–43 (1946); *Bockover v. Stemmerman*, 708 S.W.2d 179, 181–82 (Mo.Ct.App. 1986); *Urtz v. New York Central & Hudson River Railroad Co.*, 202 N.Y. 170, 95 N.E. 711, 714 (1911). The present case is distinguishable from the *Premeaux* case. In *Premeaux*, the court reviewed the jury question regarding the validity of the release separately from the jury questions regarding the plaintiff's tort theories of recovery that the release was alleged to have waived. *Premeaux*, 192 S.W.2d at 141. The court found that the release was properly voided, but only awarded damages on the negligence and proximate cause theories of recovery. *Id.* In other words, the plaintiff in *Premeaux* incurred no damage from signing the release except insofar as the release waived his claims for negligence and proximate cause. In the present case, the Swansons contend that the signing of the release itself caused them the damage of losing their interest in the diamond mine project.

■ In Texas, a defrauded party has the option to rescind a transaction or to sue for damages. *Reaves*, 307 S.W.2d at 238–39. Rescission may come too late because of a change in circumstances, but there is no reason that general contract law would not apply to allow an option to sue for damages. *See* Warren A. Seavey, *Caveat Emptor as of 1960*, 38 TEX.L.REV. 439, 449 (1960). The Swansons elected to sue for damages, i.e., for the difference between the consideration that they received for signing the release and the value of the interest that they were fraudulently induced to relinquish.

In the *Bockover* case, the court stated that a release is an exception to the general rule allowing one who alleges he has been fraudulently induced to enter into a contract to either stand upon the contract and sue for damages or elect to rescind the contract, because once a release is voided, the original cause of action remains viable and the party giving the release retains the right to recover on the underlying action and therefore suffers no damage as a result of the fraud. *Bockover*, 708 S.W.2d at 181–82. This case is distinguishable from the present case because the right or claim waived by the release in the present case was an interest in the offshore lease and sea-diamond project and not a tort or cause of action which would need to be proven separately.

In *Bilotti v. Accurate Forming Corp.*, 39 N.J. 184, 188 A.2d 24 (1963), cited by the Swansons, the court allowed the plaintiff to recover money damages for having been fraudulently induced to sign a release and to sell his stock in a corporation for an unfair price. The court held that the defrauded party could elect to affirm the fraudulent transaction and sue to recover damages sustained as a result of the fraud. *Id.*, 188 A.2d at 33; *see also Sime v. Malouf*, 95 Cal. App.2d 82, 212 P.2d 946 (1949).

In *Voskamp*, the court affirmed a judgment awarding the plaintiffs damages based on the difference between the fair market value of stock that they sold to the defendant and the price that they received because the defendant committed common-law fraud, statutory fraud, and a breach of fiduciary duty in that he made a misrepresentation or concealed material facts from the plaintiffs in inducing them to sell their stock at the lower price. 749 S.W.2d 113. The ruling in *Voskamp* does not involve a release.

■ Schlumberger contends that because the release only disposed of the Swansons' "claimed interest," and the nature and value of the Swansons' interest was and is disputed, the trial court properly entered a j.n.o.v. because the jury made no finding on the existence of the claims. The release states that "[t]here is considerable doubt, disagreement, dispute and controversy with reference to the validity of Swansons' claim."

In effect, the jury was asked about the existence and value of the Swansons' interests in the sea-diamond project in Jury Question 22. This question asked the jury to find "the value of the Swansons' interest, if any, in the diamond project," and the jury responded, "$15 million." The "if any" part of this submission asked the jury whether the Swansons had an interest in the project at all, and the value part of the question asked the jury to put a dollar figure on that interest. Schlumberger objected to Jury Question 22 as being "immaterial because none of the prior questions establishes any proper

legal predicate for awarding those damages." This objection was overruled by the trial court. While the wording of this question may be flawed, it suffices to establish the ownership and value of the Swansons' interest. It is supported by evidence. These points of error are overruled.

■■ Question 22 of the jury charge asked: "What sum of money do you find from a preponderance of the evidence to be the value of the Swansons' interest, if any, in the sea-diamond project as of October 26, 1988?" Schlumberger contends that the jury's damage finding is impermissibly speculative. Remote damages, or those purely conjectural, speculative, or contingent, are too uncertain for ascertainment and cannot be recovered. *Success Motivation Institute, Inc. v. Lawlis,* 503 S.W.2d 864, 867 (Tex.Civ. App.–Houston [1st Dist.] 1973, writ ref'd n.r.e.). The instructions accompanying Question 22 informed the jury that damages could not be "remote, speculative, or based on conjecture or guess work." Schlumberger contends that any damages awarded the Swansons based on possible future profits from the project were mere speculation because the first of the three letter agreements provided that Sedco had sole discretion to determine whether the project would move from phase to subsequent phase. Additionally, at the time the Swansons signed the release, the project was in the prospecting phase and no mining lease had yet been obtained.

Schlumberger had agreed in paragraph four of the first letter agreement that if Sedco chose to abandon any diamond grants or concessions, then it would first offer them to the Swansons. Additionally, John Swanson testified that Schlumberger agreed, in order to induce the Swansons to consent to the joining of the consortium, to give up its sole discretion if there were diamonds found in commercially paying quantities. In an April 18, 1984 letter agreement, Dillard Hammett stated that, "Sedco wants to continue its association with the Swansons in a manner in which, if there are diamonds in commercially paying quantities off shore blocks 2–C through 5–C, both parties will benefit accordingly." The Swansons contend that this letter agreement constitutes an affirmative statement by Sedco that they would pursue commercial mining if diamonds were found in commercially feasible quantities.

■ Under the out-of-pocket measure of damages, the Swansons would receive the difference between the value of that which they gave up and the value of that which they received. *Leyendecker & Associates, Inc. v. Wechter,* 683 S.W.2d 369 (Tex.1984). The Swansons maintain that because the parties stipulated to the value of what the Swansons received in exchange for signing the release, the trial court could have entered a correct judgment by simply subtracting the stipulated value from the jury's finding of the value of the interest that they had lost by signing the release.

As proof of the amount of damages, the Swansons relied chiefly upon the testimony of two expert witnesses, Dr. van Rensberg and Dr. Thomas Mayer. Dr. van Rensberg underwent an analysis in which he determined future production and royalties and performed a discounted cash flow analysis to determine the value of the Swansons' interest. He found that the Swansons' interest had a value of $88 million. Discounted cash flow analysis is also known as capitalization of income. In *Polk County v. Tenneco, Inc.,* 554 S.W.2d 918, 921 (Tex.1977), the court recognized that this approach is often useful to value income-producing properties that are of a type that are rarely sold and, therefore, a comparable sales method of appraisal property would be of little use. Dr. Mayer performed a different analysis and concluded that the Swansons' interest had a value of between $107 million and $227 million.

Schlumberger charges that the Swansons' experts improperly assumed that the lease owned by Schlumberger at the time the release was signed, the prospecting lease, would still be in effect for up to forty-seven years even though that lease was set to expire in 1990. Schlumberger cites to the case of *Magcobar North American v. Grasso Oilfield Services Inc.,* 736 S.W.2d 787, 797–98 (Tex.App.–Corpus Christi 1987), *writ dism'd by agr.,* 754 S.W.2d 646 (Tex.1988), for the proposition that the appropriate time for measuring lost profits is the period between the beginning and the end of the lease term.

But the only discernible reason why the court in *Magcobar* used the lease term for measuring lost profits was the fact that the jury question on lost profits used that term. Additionally, the Swansons point out that the jury heard testimony from a professional South African diamond miner who testified that, once a company has performed prospecting on a prospecting lease, it was not difficult to then get a mining lease.

▓ Schlumberger further contends that the jury's response to Question 22 could represent contractual damages based upon a breach of the three letter agreements and that because the Swansons did not plead a breach of a contractual obligation or a breach of any partnership agreement, the trial court correctly set aside the damage finding. In *Southwestern Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493 (Tex.1991), the only case cited by Schlumberger on this point, the Supreme Court stated that if the defendant's conduct would give rise to liability independent of the fact that a contract exists between the parties, the plaintiff's claim may also sound in tort; conversely, if the defendant's conduct would give rise to liability only because it breaches the parties' agreement, the plaintiff's claim ordinarily sounds only in contract. The Swansons alleged fraud in a breach of fiduciary duty on the part of Schlumberger, causing the Swansons to sign away their rights in the release. The fact that damages for such a hypothetical contract claim could be similar to the damages found by the jury in the present case would not bar the Swansons from bringing their tort claims for fraud. The Swansons do not seek to enforce the contract (which was the lease), but to be reimbursed for the loss of their ownership rights because of that contract. Any party defrauded of property has a tort cause of action on the basis of fraud, and the relationship between the parties only went to establish what duties are owed by Schlumberger in disclosure and representations. The fraud is not tied to the fact that the interest was obtained from or with Schlumberger. Any party deprived of an interest by fraud will be entitled to damages whether the property had been obtained from or with Schlumberger. It is only through the relations that a higher duty arises in representations and

disclosures. These points of error are overruled.

## EXEMPLARY DAMAGES

▓ Exemplary damages are recoverable for fraud, as well as for a breach of fiduciary duty. *See Trenholm*, 646 S.W.2d at 933 (fraud); *Murphy v. Canion*, 797 S.W.2d 944, 949 (Tex.App.–Houston [14th Dist.] 1990, no writ) (breach of fiduciary duty). The Swansons contend that the evidence was sufficient to support the jury's findings on the requisite state of mind, the character of the wrong, and the ratification and involvement of executives at the highest levels of both defendants. The Swansons also request that this court add the exemplary damages awarded under the common-law remedy with the exemplary damages awarded under the statutory remedy for a total exemplary damages award of $45 million. In *Berry Property Management v. Bliskey*, 850 S.W.2d 644 (Tex.App.–Corpus Christi 1993, writ dism'd by agr.), the court held that it was proper to stack DTPA treble damages and common-law exemplary damages.

▓ Schlumberger contends that the Swansons may not recover punitive damages because they failed to obtain an independent jury finding of tort injury, and the actual damages awarded by the jury are the same as would have been awarded for contractual damages. The jury found that Schlumberger made fraudulent misrepresentations, as well as fraudulent nondisclosure, which were relied on by the Swansons. This is a finding of a tort injury. The Swansons are not seeking nor did they recover contractual damages by enforcement of the contract to get the benefit of the bargain, which under the terms of the contract was two million rand, or by rescission of the contract, which would have reinvested them with the interest that they owned prior to the release. Instead, they sought and obtained jury findings of fraud. When a person is fraudulently induced to enter into a contract and has sustained damages thereby, he may stand on the contract and bring an action to recover those damages. Such an action sounds in tort. Rescission is not a prerequisite to such an action.

*Santa Maria Water Control & Improvement Dist. v. Towery Equip. Co.*, 241 S.W.2d 755 (Tex.Civ.App.–El Paso 1951, no writ). Each of the cases cited by Schlumberger under this cross-point dealt with situations wherein the plaintiff had pled both a breach of contract and some type of tort theory of recovery. *See, e.g., Bellefonte Underwriters Ins. Co. v. Brown*, 704 S.W.2d 742 (Tex.1986); *C & C Partners v. Sun Exploration & Production Co.*, 783 S.W.2d 707, 719 (Tex.App.—Dallas 1989, writ denied).

## ATTORNEY'S FEES

 In response to Jury Question 27, the jury found that a reasonable fee for Swansons' attorneys for work done was twenty-five percent of the recovery. This finding was predicated on the jury having made a "we do" determination on Question 12, which was the question concerning the Swansons' statutory fraud claim. Under TEX.BUS. & COM.CODE ANN. § 27.01(e) (Vernon 1987), any person who violates the provisions of this section shall be liable to the person defrauded "for reasonable and necessary attorney's fees." Schlumberger contends that the Swansons are not entitled to recover any fees because they failed to segregate attorney's fees for the statutory fraud claim from those on the common-law fraud claim. *See Stewart Title Guaranty Co. v. Sterling*, 822 S.W.2d 1, 10–12 (Tex.1991). The Swansons' fee expert testified that he had made no effort to segregate what the fee should be for work done on these two separate causes of action. The determination of whether attorney's fees can be segregated between two causes of action is a question for the court. *See id.* Attorney's fees do not need to be segregated when the claims alleged arose out of the same transaction and are so interrelated that their prosecution or defense entails proof or denial of essentially the same facts. *Id.* This is obviously the situation in the present case dealing with statutory and com-

mon-law fraud as inducing the same transaction.

A former Texas Supreme Court Justice, James P. Wallace, testified that reasonable and necessary fees should be awarded by a percent of the total recovery, between twenty-five and fifty percent. Several courts have held that it is proper to award statutory attorney's fees as a percentage of total recovery. *See Kerrville HRH, Inc. v. City of Kerrville*, 803 S.W.2d 377, 387 (Tex.App.–San Antonio 1990, writ denied); *March v. Thiery*, 729 S.W.2d 889, 897 (Tex.App.–Corpus Christi 1987, no writ).

Schlumberger also contends that the trial court erred in overruling its objection to Jury Question 27 because the jury question omits the requirement that the attorney's fees be *necessary* as set forth in Section 27.01(e) of the Business and Commerce Code. This section states that "[a]ny person who violates the provisions of this section shall be liable to the person defrauded for *reasonable and necessary* attorney's fees, expert witness fees, costs for copies of depositions, and costs of court." TEX.BUS. & COM.CODE ANN. § 27.01(e) (emphasis added).

The question presented to the jury was "[w]hat do you find from a preponderance of the evidence is a reasonable fee, if any, for the necessary services of The Swansons' attorneys in this case, stated as a percentage of The Swansons recovery?"

Schlumberger duly objected to this issue on the basis that it did not read "reasonable and necessary." The Swansons respond that this issue has been taken directly from the Texas Pattern Jury Charges.[7]

 Is it necessary to use *necessary?* We think it is. The difference in the statutory language and the language in the charge is that the word *necessary* is used in the statute adjectively to modify attorney's fees, and in the jury question the word *necessary* is used adjectively to modify services. The basis for this requirement is that the services

---

7. In 4 STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES PJC 110.15 (1990), the jury question is worded as follows: "What is a reasonable fee for the necessary services of *Paul Payne's* attorneys in this case, stated in dollars and cents?"

In 4 STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES PJC 110.16 (1990), the jury question is worded as follows: "What is a reasonable fee for the necessary services of *Paul Payne's* attorneys in this case, stated as a percentage of *Paul Payne's* recovery?"

are necessary in pursuing the litigation, and although the term *services* is not mentioned in the statute, services earning the attorney's fees are necessarily implied and would be the logical necessity brought about by the litigation. This change in the position of the word *necessary* does not change the meaning. This point of error is overruled.

## PREJUDGMENT INTEREST

■ The Swansons contend that, should the court reverse and render the judgment of the trial court, it should also award them prejudgment interest in the amount of ten percent compounded daily from the date of the loss, suggested as October 26, 1988, the date of the signing of the release, to the date of judgment. *See Cavnar v. Quality Control Parking,* 696 S.W.2d 549 (Tex.1985); *see also City of Houston v. Wolfe,* 712 S.W.2d 228, 230 (Tex.App.–Houston [14th Dist.] 1986, writ ref'd) (extending *Cavnar* to business tort cases). We agree that the Swansons are entitled to prejudgment interest at ten percent, but because this case comes after the amending of the statute, this would be compounded annually and not daily. TEX.REV. CIV.STAT.ANN. art. 5069–1.05 (Vernon Supp. 1994).[8]

The judgment of the trial court is reversed and judgment is rendered based on the jury's findings in the amount of $14,185,999.20 (which is the $15,000,000 found by the jury less $814,000.80, which was stipulated as received by the Swansons), plus exemplary damages of $35,000,000, and ten percent prejudgment interest per annum from October 26, 1988, until July 2, 1993, the date upon which the judgment should have been entered ($7,979,053.15), and attorney's fees of twenty-five percent of the total recovery ($14,291,263.09), and post judgment interest from July 2, 1993 until paid.

## ON MOTION FOR REHEARING

■ Schlumberger contends on rehearing that this Court erred by failing to address its contention that the evidence was factually and legally insufficient to support the jury

award of $35 million dollars as punitive damages. We have once again reviewed the brief. A cross-point does appear that raises exactly that issue. However, the brief contains no argument or authority in support of this contention. In the absence of any briefing in support of this contention, the point of error is waived. *Fredonia State Bank v. General American Life Ins.,* 881 S.W.2d 279 (Tex.1994), *citing Inpetco, Inc. v. Texas American Bank/Houston N.A.,* 729 S.W.2d 300 (Tex.1987), and *Davis v. City of San Antonio,* 752 S.W.2d 518, 521 (Tex.1988); *see also Valdez v. Aldrich,* No. C14–94–00057–CV, 892 S.W.2d 95 (Tex.App.—Houston [14th Dist.] 1994).

Schlumberger also contends that this court erred by stating that TEX.REV.CIV.STAT.ANN. art. 5069–1.05 governed the award of prejudgment interest in this case. We cited this section only for establishing the rate of prejudgment interest as required by *Cavnar*. "Prejudgment interest shall accrue at the prevailing rate that exists on the date judgment is rendered according to the provisions of TEX.REV.CIV.STAT.ANN. art. 5069–1.05, § 2 (Vernon Supp.1985)" (This section now appears in TEX.REV.CIV.STAT.ANN. art. 5065–1.05, § 6(g) (Vernon Supp.1995)). *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549, 554 (Tex.1985).

■ Schlumberger contends that we should remand this case to the trial court so that it may determine in its discretion whether equitable prejudgment interest should be awarded. In advancing this argument, Schlumberger cites the court to *Spangler v. Jones,* 861 S.W.2d 392, 398 (Tex.App.—Dallas 1993, writ denied). However, the authority cited by the court in *Spangler* does not suggest that a remand is necessary for this determination. In *Perry Roofing Co. v. Olcott,* 744 S.W.2d 929, 930 (Tex.1988), *citing Cavnar,* 696 S.W.2d at 556, the Texas Supreme Court noted that it had awarded prejudgment interest based on equity, (as did this court in the present case) and did not see fit to remand to the trial court to make such a determination. In *Perry Roofing,* the

8. This statute was amended effective 1987 and reads as follows: "The rate of prejudgment interest shall be the same as the rate of postjudgment interest at the time of judgment and shall be computed *as simple interest.*" (Emphasis added.)

Texas Supreme Court extended the holding in *Cavnar* to apply to a breach of contract action for unascertainable damages. We do not believe that such prejudgment interest is discretionary with the trial court, but rather is a mandatory entitlement in all cases in which it is applicable. What the trial court does have discretion over is when this interest accrues during periods of delay in the trial. *See* TEX.REV.CIV.STAT.ANN. art. 5069–1.05, § 6(d) (Vernon Supp.1995); *Southwest Airlines Co. v. Jaeger*, 867 S.W.2d 824 (Tex. App.—El Paso 1993, no writ); *Richter S.A. v. Bank of America Nat'l Trust and Sav.*, 939 F.2d 1176 (5th Cir.1991).

This Court abated this proceeding for thirty days for the trial court to make a determination about when the equitable prejudgment interest would accrue. In an order signed February 15, 1995, by the trial judge, a determination was made that the prejudgment interest began to accrue on October 26, 1988. The trial court further found that because of a delay caused by the plaintiffs, no prejudgment interest should accrue for forty-two days covering the period from March 22, 1993 to May 3, 1993. The judgment shall be amended to reflect the proper time for the running of the equitable prejudgment interest.

The motion for rehearing is overruled.