**ROOT et al. v. TOMBERLIN et al.**

No. 2488.

Court of Civil Appeals of Texas. El Paso.
Feb. 12, 1931.

Rehearing Denied March 5, 1931.

Sayles & Sayles, of Abilene, and Cyrus B. Frost, of Eastland, for appellants.

Wagstaff, Harwell, Wagstaff & Douthit, of Abilene, and Goree, Odell & Allen and Chas. L. Morgan, all of Fort Worth, for appellees.

WALTHALL, J.

C. M. Root and S. M. Root, partners, composing the firm of Root Drilling Company, brought this suit against J. L. Tomberlin, Paul Vitex, Leigh Taliaferro, and L. H. Wentz, to recover a balance of a debt of $4,050.50, with interest thereon, alleged to be due plaintiffs for work done and materials furnished in drilling a test well for oil and gas under a written contract of date April 8, 1927. The contracts referred to in the pleading were made parts of the findings of the court and herein fully stated. Plaintiffs allege, in substance, that Tomberlin for himself and his assigns, Wentz, as assignee of an undivided half interest in the oil and gas leasehold estate in the land on which the test well was to be drilled and as copartner with Tomberlin in the prosecution of the enterprise or business of drilling such test well, entered into said written contract with plaintiffs for the drilling by plaintiffs for Tomberlin and Wentz of said test well; that Wentz became and was a partner with Tomberlin in drilling said well and as such partner became and was jointly liable with Tomberlin to plaintiff under said drilling contract; that as security for a part of the amount payable plaintiffs under said contract, there was transferred and delivered to plaintiffs the written obligation of Vitex, known as the purchase letter, to pay $3,500; Taliaferro was the agent of Wentz, but if not such agent, he (Taliaferro) was personally liable to the plaintiffs.

Pleadings of the plaintiffs and the defendants are lengthy, and as the trial resulted in a question solely of partnership between Tomberlin and Wentz, and of Wentz's liability as such, we need not state the pleadings more than to say that Wentz filed a general denial, and specially denied any partnership relation with Tomberlin in the matters here involved. The case was tried to the court without a jury, and the court, having found that no partnership relation was created between Tomberlin and Wentz in the matters about which the suit was brought, entered judgment as between plaintiffs and all defendants other than Wentz, from which no appeal is prosecuted.

The court entered judgment that plaintiffs take nothing as to Wentz, and from that part of the judgment solely, plaintiffs prosecute this appeal.

The matters of contract between the parties and made the basis of this plaintiff's cause of action and of defendant Wentz's ground of defense are stated in the trial court's findings of fact. While the matters found are of great length and much of it might have been omitted, if closely analyzed, we have thought best to copy the court's findings here. The findings are as follows:

"Findings of Fact.

"1. On March 25th, 1927, written agreement was made between J. L. Tomberlin and the Amerada Petroleum Corporation whereby such Corporation agreed to assign to Tomberlin Oil and gas leases covering certain lands in Jones County, Texas, including the S. W. ¼ of the S. W. ¼ of Section 37, Block 16, T. & P. R. R. Co: upon which Tomberlin agreed to drill a well to a depth of 2500 feet, unless oil and gas in paying quantities was found at a lesser depth. Tomberlin agreeing to spud in and commence actual drilling of such well by April 10, 1927. Assignment of oil and gas lease was made by the Amerada Petroleum Corporation to Tomberlin on April 5th, 1927.

"2. Negotiations between J. L. Tomberlin and the Root Drilling Company, a partnership composed of plaintiffs C. M. Root and S. M. Root, for the drilling of the well in controversy, extended over a period of about thirty days, during which time J. L. Tomberlin and S. M. Root went to Cisco, Texas, to see the Amerada Petroleum Corporation, who extended the time for the commencement of the well for about thirty days from April 10, 1927.

"3. It was first agreed between J. L. Tomberlin and the Root Drilling Company that such Company would drill the well as a turnkey job, but Tomberlin was unable to furnish the money or purchase orders to pay for same and such first agreement was cancelled and on April 8th, 1927, the following written agreement was made:

" 'Drilling Contract.

" 'This agreement made this 8th day of April, 1927, by and between J. L. Tomberlin, party of the first part, and Root Drilling Company, party of the second part, witnesseth:

"'That the party of the second part hath covenanted and agreed with party of the first part, his successors or assigns, that it will drill for said party of the first part a certain well for the purpose of obtaining petroleum oil or natural gas, to be known as well No. 1 on the farm of J. L. Hendricks, located in the Southwest corner of Section 37, Block 16, T & P R. R. Co. lands, Jones County, Texas.

"'That party of the second part agrees to furnish a complete National Drilling Machine, together with all necessary tools, machinery, equipment and appliances for the drilling of said well. The party of the second part also agrees to furnish fuel, water, labor and everything necessary to drill and complete said well to a depth of 2500 feet, unless oil or gas is found in paying quantities at a lesser depth.

"'The party of the first part agrees to pay party of the second part for the drilling of said well the sum of $9,600.00 which shall be in full payment for the drilling of said well to the depth of 2500 feet and shall include payment of everything necessary to drill the well, including the plugging of said well and pulling the casing in accordance with the regulations set out by the railroad commission of the State of Texas.

"'Party of the first part will not be responsible and will not have to pay for any shut down time or delay for any reason except for delay on delivery of pipe. Said pipe to be in good order and acceptance to party of the second part.

"'Party of the second part will carry compensation insurance as required by law and will furnish party of the first part with evidence that the policy is in force at the time of the beginning of the drilling of said well.

"'Party of the first part agrees to place in escrow in the Abilene State Bank purchase orders amounting to $8,500.00 which are hereby accepted by the party of the second part as security for the amount of said contract as above mentioned, and the balance of $1,-100.00 to be placed in escrow before well reaches 1000 feet.

"'In witness whereof the parties have hereunto set their hands and seal, this the 8th day of April, A. D. 1927.
"'J. L. Tomberlin

   "'Party of the First Part

"'Root Drilling Company
 "'By S. M. Root

   "'Party of the Second Part

"'Witnesses:
 "'Mary Bryan
 "'J. H. Maxey'

"4. The following written purchase order or agreement was placed by J. L. Tomberlin in escrow with the Abilene State Bank:
  "'L. H. Wentz (Oil Division)

"'April 14, 1927.
"'Jess Tomberlin,
 "'419 Alexander Bldg.,
 "'Abilene, Texas.
"'Dear Mr. Tomberlin:
"'Subject to the conditions stated below, we agree to purchase from you, and, by your acceptance and signature of this letter, you agree to sell to us oil and gas leases on the following described land:

| | |
|---|---|
| N. ½—NE ¼ Sec. 20 | 80 acres |
| S. ½—SE ¼ Sec. 20 | 80 acres |
| SW ¼—NE ¼ and NW ¼—SE ¼ Sec. 20 | 80 acres |
| N ½ of E 80 acres of W ½ of Sec. 20 | 40 acres |
| E 80 acres of N. 160 acres of L. H. Lee land in Section 21 | 80 " |
| W ½—NW ¼ Sec. 36 | 80 " |
| NW ¼—SW ¼ Sec. 36 | 40 " |
| SW ¼—NE ¼ and NW ¼—SE ¼ Sec. 36 | 40 " |
| S ½—SE ¼ Sec. 36 | 80 " |
| Total | 640 " |

"'Also an undivided one-half interest in the oil and gas lease on the S. W. ¼ Sec. 37.

"'All being located in Block 16, T. & P. R. R. Survey Jones County Texas.

"'(1) You are to drill a well, to be located 150 feet North of the center of the south line of the southwest quarter of the southwest quarter of Section 37, Block 16. This well to be drilled to a depth of 2500 feet, unless oil in paying quantities is encountered at a lesser depth. This well is to be drilled free of cost or liability to L. H. Wentz.

"'(2) In case production in commercial quantities is encountered in the test well on the 40 acres (SW ¼—SW 14 Sec. 37), we are to be free of expense or liability until the well is shown to be a commercial producer, at which time you are to execute with us a joint operating contract," and the forty acres owned jointly shall be operated by L. H. Wentz.

"'(3) You are to deliver to us valid assignments of oil and gas leases on all of the acreage above described, the leases to have at least four years in which to remain in force, to be on the Producer 88 form, and to carry no unusual clauses, drilling obligations, or rental in excess of $1.00 per acre per year.

"'(4) You are to furnish abstracts of title and to satisfy such title objections as may be raised by our attorney.

"'(5) The total consideration to be paid to you is the sum of six thousand dollars ($6000.-00) which shall be due and payable to you upon the completion of the test well to a depth of 2500 feet, or the completion of the well as a commercial producer, and upon the acceptance of title to the above described acreage by our attorney.

" 'If the above conforms to your understanding, kindly indicate your agreement and acceptance of same by signing this letter and returning to Box 1002, Eastland, Texas.

" 'L. H. Wentz (Oil Div.)
" 'By [signed] Leigh Taliaferro
" 'Accepted: J. L. Tomberlin.'

"5. The form of the 'Humble Joint Operating Contract' referred to in paragraph (2) of the above agreement between L. H. Wentz and J. L. Tomberlin is a contract between the owner of an undivided interest in an oil and gas lease as First Party and the Humble Oil & Refining Company, the owner of the remaining undivided interest in the same oil and gas lease as Second Party and provides:

" 'I. Second party shall have exclusive charge, control and supervision of all operations of every kind to be conducted on said land for the development, production, treating, handling and marketing of oil, gas and other minerals therefrom, as well as the payment of rentals, royalties, taxes and other charges which may arise or become due.

" 'II. Second Party shall charge to joint account (which shall be borne by the parties hereto in proportion to the interest of each in the lease as is above set forth) all costs and expenses incurred in connection with the operation of said premises as herein contemplated, including all labor directly employed in connection with the operation of said property; all materials, supplies and equipment, including rentals on all trucks, drilling rigs, tools, pipe, etc., let to joint account for use in connection with the operation of said property, at the current prevailing rental charge by Second Party to its own or other joint leases, said trucks, rigs and other rented property to be returned by joint account in the same condition as when received, reasonable wear and tear excepted; miscellaneous field expenses apportionable in connection with operations on the above described property; all charges for fuel, water, power, teaming and other services incurred in connection with the operation of said premises as herein contemplated, such charges to be made only for actual services rendered and at the current customary rates prevailing in the field; losses, damages or liabilities sustained or incurred in connection with the operation of said property; expenses of marketing the products; rentals, royalties and other items payable under the terms of the lease covering said land; gross production, ad valorem and other taxes and governmental charges; workmen's compensation, liability, fire, wind, tornado and other insurance premiums paid. Used materials removed from the premises, whether upon abandonment or currently in course of operation, if taken over by Second Party as its own, shall be credited to joint account at the current prevailing discounts used by Second Party upon removal of such materials from its own and other joint properties operated by it. Upon final abandonment of the premises, at the request of First Party materials and equipment removed therefrom may be divided in kind and each party hereto receive its proportion thereof.

" 'An annual inventory shall be made of the physical equipment on the premises of which First Party shall be given notice and opportunity to be represented. On the basis of this inventory adjustments shall be made. By failing to participate in the taking of such inventory after notice, First Party thereby concedes the correctness of the inventory made.

" 'Second Party shall keep an accurate record of all joint accounts hereunder, showing the costs and expenses incurred and charges made and all credits and returns made and received, which shall be available at all reasonable times for the examination and inspection of First Party and his or its duly authorized representatives. First Party shall also have access at all reasonable times to the well and production records and reports relating to said premises.

" 'Within one month after the close of each calendar month, Second Party shall furnish to First Party a statement of investment and expenses incurred and credits and receipts during such calendar month.

" 'III. First Party agrees to pay Second Party at Houston, Texas, First Party's proportionate part of all costs and expenses incurred against and charges made to joint account by Second Party in connection with the operation of said lease hereunder based on First Party's interest in the premises, as above set forth.

" 'IV. Second Party shall have charge and control of the marketing of all oil, gas and other minerals produced from said premises and accruing to the parties hereto and, upon the sale of same, shall pay or credit to First Party as herein provided, the proceeds in proportion to First Party's interest in the premises.

" 'Second Party may apply the proceeds accruing to First Party hereunder on indebtedness in favor of Second Party by reason of expenses incurred and charges made for joint account in connection with the operation of said property.'

"6. Assignment dated April 13, 1927, was made by J. L. Tomberlin to L. H. Wentz of an undivided half interest in the oil and gas lease covering the S. W. ¼ of the S. W. ¼ of Section 37, Block 16, T. & P. R. R. Co. land in Jones County, Texas, on which the well was to be drilled.

"7. The Root Drilling Company drilled the well to a depth of more than 2500 feet and complied with all of their obligations set out in their drilling contract, but have not been paid a balance due them thereunder of $4050.50.

"8. The drilling of such well was not commenced until after the date of the purchase order or agreement between L. H. Wentz and J. L. Tomberlin and all labor and material were performed and furnished after such date. Neither C. M. Root nor S. M. Root saw such purchase order or agreement or knew of the provision therein that the well was to be drilled free of costs and liability to L. H. Wentz until after this suit was filed, which was long after the completion of the well. The well was drilled to completion on September 2nd, 1927, as a dry hole and never produced oil or gas.

"9. The following correspondence was had between Root Drilling Company and L. H. Wentz's agents:

"'May 17, 1927.

" 'Mr. L. H. Wentz,

" 'Ponca City, Oklahoma.

" 'Attention Mr. Leigh Taliforo:

" 'We are drilling a well for J. L. Tomberlin in Section 37 block 16 T & P Railway Company lands, Jones County, Texas, and to secure the payment of the drilling contract Mr. Tomberlin has placed a purchasing order from you dated April 14, 1927, calling for the payment of $6000.00 in escrow in the Abilene State Bank at Abilene, Texas. Said escrow being signed by J. R. Tomberlin and Root Drilling Company. The $6000.00 to be placed to the Root Drilling Companies account when paid by your Company.

" 'In paying this purchase order please make check payable to the Abilene State Bank as per escrow agreement.

" 'Yours very truly

" 'Root Drilling Company

" 'ALA-b                    By ————,

" 'Address all communications to L. H. Wentz —Oil Division.

"'May 19, 1927.

" 'Root Drilling Company,

" 'Eastland, Texas.

" 'Gentlemen: Attention: Mr. A. L. Agate.

" 'Replying to yours of May 17 relative to payment of purchase order given to J. L. Tomberlin for acreage in Jones County, contingent upon the drilling of a well.

" 'Any assignment of this purchase order would have to be made by Mr. Tomberlin as we would have no legal authority to make transfer without his written consent.

" 'I suggest that you take this matter up with Mr. Ed Owen at our Eastland Office.

" 'Yours very truly,

" 'LT–c          [Signed] Leigh Taliaferro

" 'CC to Mr. Ed W. Owen.

" 'Exchange Nat'l Bank Bldg.,

" 'Eastland, Texas.'

" 'L. H. Wentz (Oil Division)

" 'Ponca City, Okla.

" 'Address all communications to L. H. Wentz-Oil Division

" 'Texas Office

"Exchange National Bank Bldg.

" 'Eastland, Texas.

" 'May 21, 1927.

" 'Root Drilling Company

" 'Eastland, Texas.

" 'Gentlemen:

" 'I received this morning a copy of your letter of May 17th, addressed to L. H. Wentz, Ponce City, regarding the J. L. Tomberlin Purchase Order; also, a copy of letter from Leigh Taliaferro to you dated May 19th, in regard to the same matter.

" 'This is to advise that the total amount due on the Tomberlin Purchase Order is $5,250.00, instead of $6,000.00. We shall have to have an order from Mr. Tomberlin regarding the place and manner of making payment, consequently, if this order has been assigned to you, you should have Mr. Tomberlin send written notice to this office.

" 'May we take this opportunity of advising you that any communication along this line should be addressed to the Eastland Office.

" 'Yours very truly,

" 'L. H. Wentz (Oil Division).

" 'By Ed. W. Owen [Signed]'

" 'EWO:CMS.

"10. Out of this $6,000.00 named in the L. H. Wentz-J. L. Tomberlin purchase order or agreement, $5,250.00 thereof was paid to Root Drilling Company and applied as a credit on their drilling contract.

"11. The 40 acre tract upon which the well was drilled is designated on the map of this drilling block as 'J. L. Tomberlin & Wentz'. The log of this well designates this well as 'J. L. Hendricks' No. 1-L. H. Wentz and J. L. Tomberlin.' "

Opinion.

Appellants' suit is based upon the proposition that the facts found by the court show that Wentz and Tomberlin were partners in the drilling of the test well, at the time the drilling contract sued on became effective by delivery, and that Wentz, being a partner with Tomberlin, was liable to appellants for the balance due thereon. Appellants submit that the provisions used in the purchase order letter, "this well is to be drilled free of cost or liability to L. H. Wentz," and, "we are to be free of expense or liability until the well is shown to be a **commercial producer,**" limit the liability as

between themselves, Wentz and Tomberlin; the provisions do not have the effect of freeing Wentz from liability to appellants as creditors of the partnership of Wentz and Tomberlin.

We have stated at length the contracts between Tomberlin and the Amerada Petroleum Corporation, whereby that corporation agreed to assign to Tomberlin the land in controversy upon which Tomberlin agreed to drill a well to a depth of 2,500 feet unless oil and gas in paying quantities was found at a less depth. We have also stated the provisions of the drilling contract between Tomberlin and appellants in which Tomberlin agreed to pay appellants the sum of $9,600 for the drilling of the well, and in which Tomberlin agreed to place in escrow purchase orders amounting to $8,500 accepted by appellants, as security for the amount to be paid for the drilling of said well. In discharge of the agreement Tomberlin placed in escrow the purchase order of Wentz above stated. The purchase order, briefly stated, provides that, subject to the conditions, Wentz agrees to purchase from Tomberlin oil and gas leases on the lands described; also an undivided one-half interest in the oil and gas lease on the 40 acres on which the well was to be drilled. The conditions briefly stated are: (1) Tomberlin was to drill a well, its location stated; its depth 2,500 feet unless oil in paying quantities is encountered at a lesser depth; the well to be drilled free of cost to Wentz. (2) In case production in commercial quantities is encountered in the test well, Wentz "to be free of expense or liability until the well is shown to be a commercial producer, at which time you (Tomberlin) to execute with us (Wentz) a joint operating contract (stating the form of the Humble Joint Operating Contract), and the 40 acres owned jointly shall be operated by L. H. Wentz." (3) Tomberlin to deliver to Wentz assignments of oil and gas leases on the other lands mentioned. (4) Tomberlin to furnish satisfactory abstracts of title. (5) "The total consideration to be paid to you is the sum of $6,000.00, which shall be due and payable to you upon completion of the test well to a depth of 2500 feet, or the completion of the well as a commercial producer, and upon the acceptance of title to the above described acreage by our attorney." The above was accepted by Tomberlin, and assigned by Tomberlin to appellants and placed in escrow. Tomberlin assigned to Wentz an undivided half interest in the oil and gas lease on the 40 acres on which the test well was to be drilled. Appellants did not see the Wentz purchase order until after this suit was filed. Appellants drilled the test well to a depth of more than 2,500 feet, and there was a balance due them on the drilling contract of $4,050.50. On his purchase order Wentz paid to Tomberlin $750, and paid to appellants $5,250, on the completion of the test well. The sum of $4,050.50 sued for is the unpaid balance of the contract price for digging the test well.

Appellee, in his counter propositions, submits that the purchase order or contract between himself and Tomberlin did not create a partnership; that an agreement dependent upon a contingency or condition does not create a copartnership unless and until the happening of the contingency or the fulfillment of the condition; that in this instance the future relationship between appellee and Tomberlin depended upon oil in paying quantities being encountered in the test well; and that the well was completed as a nonproducer and the project was abandoned. Tomberlin and appellee never entered into the operating contract contemplated by the purchase order in which they were to share in the profit and loss according to their interests.

Under the facts stated Wentz and Tomberlin jointly owned the 40 acres on which the test well was put down, but the joint ownership alone did not constitute the mining copartnership such as Wentz and Tomberlin had in contemplation. That is evident from the written purchase order or agreement, in which it is expressly agreed that in case production of oil in commercial quantities is encountered in the test well in which Wentz had acquired his interest, Wentz and Tomberlin were then to execute the operating contract. The contingency upon which the operating contract was to be executed never happened and the operating contract was never executed. No contract was executed between Wentz and Tomberlin, and there was no condition under which they could operate their joint interest from which a profit and loss could be made.

In Wagner Supply Co. v. Bateman, 118 Tex. 498, 18 S.W.(2d) 1052, 1055, the Supreme Court said:

"The rule is that a mining partnership arises by operation of law where co-owners work a mine."

Here there was no mine to work, only a mine in contemplation.

In 47 C. J. p. 640, par. 1, it is said that no definition of a partnership seems more accurate and comprehensive than that of Chancellor Kent, as follows:

"A contract of two or more competent persons to place their money, effects, labor and skill, or some or all of them, in lawful commerce or business, and to divide the profit and bear the loss in certain proportions. In general the courts have agreed upon the essentials as therein stated."

With us an agreement to share in losses is not essential to a partnership, sharing in profits being sufficient. Cothran v. Marmaduke, 60 Tex. 370. As said in Story on Partnership, "He who is to take a part of the profits shall, by operation of law, be made

liable to losses to third persons." Here there is no sharing of profits, no community of power of management of the joint interest, except as the parties had in contemplation on the happening of production of oil in the test well, which never occurred. Hence, Wentz and Tomberlin never at any time placed their joint interest in the lease in any business or operation to realize a profit. We have concluded that the facts do not show a partnership, and that Wentz, never having assumed any existing liability, was not liable for any balance due appellants.

The trial court was not in error in his conclusion.

The case is affirmed.