# IN THE SUPREME COURT OF TEXAS

════════════

No. 17-0862

════════════

ENERGY TRANSFER PARTNERS, L.P. AND
ENERGY TRANSFER FUEL, L.P., PETITIONERS,

v.

ENTERPRISE PRODUCTS PARTNERS, L.P. AND
ENTERPRISE PRODUCTS OPERATING LLC, RESPONDENTS

═══════════════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIFTH DISTRICT OF TEXAS

═══════════════════════════════════════════

**Argued October 8, 2019**

CHIEF JUSTICE HECHT delivered the opinion of the Court.

The issue in this case is whether Texas law permits parties to conclusively agree that, as between themselves, no partnership will exist unless certain conditions are satisfied. We hold that it does and that the parties here made such an agreement. Accordingly, we affirm the judgment of the court of appeals.[1]

## I

Cushing, Oklahoma is a major trading hub for crude oil. For decades, the United States imported most of its crude oil from abroad to its Gulf Coast refineries, where the oil was processed

─────────────

[1] 529 S.W.3d 531 (Tex. App.—Dallas 2017).

and shipped north through Cushing. In 2008, new technology enabled oil production in the Dakotas and Canada, resulting in oil being transported to Cushing from the north. But no pipeline existed to move oil stored at Cushing south. An excess supply accumulated, driving down the price of oil sold there. Sensing economic opportunity, major pipeline companies began exploring ways to move oil south from Cushing.

Among them were ETP[2] and Enterprise,[3] competitors that are among the ten largest energy companies in the United States. Enterprise co-owned with ConocoPhillips a pipeline called Seaway that sent oil north to Cushing from the Texas Gulf Coast. Enterprise lobbied ConocoPhillips for years to reverse the pipeline's direction, but ConocoPhillips refused. Enterprise also talked to Canadian pipeline company Enbridge about a joint project but to no result.

In March 2011, Enterprise approached ETP about converting a pipeline called Old Ocean into one that could move oil south from Cushing. Old Ocean transports natural gas from Sweeny, Texas, near the Coast, up to Maypearl, near Dallas. ETP owns the pipeline, but Enterprise holds a long-term lease on it. Converting the pipeline to one for transporting oil and extending it the rest of the way to Cushing would require a massive investment from the parties and committed customers willing to pay a sufficient tariff to justify the investment.

The parties agreed to explore the viability of the project, which they dubbed "Double E". In three written agreements, they reiterated their intent that neither party be bound to proceed until each

[2] We refer to petitioners Energy Transfer Partners, L.P. and Energy Transfer Fuel, L.P. together as "ETP".

[3] We refer to respondents Enterprise Products Partners, L.P. and Enterprise Products Operating LLC together as "Enterprise".

company's board of directors had approved the execution of a formal contract. The Confidentiality Agreement, signed in March 2011, recited that Enterprise and ETP had "entered into discussions with each other in connection with a possible transaction involving a joint venture to provide crude oil transportation [from Cushing to Houston] utilizing [the] Old Ocean Pipeline". The agreement laid out the parties' rights and responsibilities with respect to confidential information exchanged during the discussions and then stated:

> The Parties agree that unless and until a definitive agreement between the Parties with respect to the Potential Transaction has been executed and delivered, and then only to the extent of the specific terms of such definitive agreement, no Party hereto will be under any legal obligation of any kind whatsoever with respect to any transaction by virtue of this Agreement or any written or oral expression with respect to such a transaction by any Party or their respective Representatives, except, in the case of this Agreement, for the matters specifically agreed to herein. . . .

In April, the parties also signed a Letter Agreement with an attached "Non-Binding Term Sheet". The Letter Agreement again recited that the parties were "entering discussions regarding a proposed joint venture transaction involving the construction (or conversion, as applicable) and operation of a pipeline to move crude oil" from Cushing to Houston, and that the "letter [was] intended only to set forth the general terms of the Transaction between the Parties, . . . contained in the term sheet attached". The letter then stated:

> Neither this letter nor the JV Term Sheet create any binding or enforceable obligations between the Parties and, except for the Confidentiality Agreement . . . , no binding or enforceable obligations shall exist between the Parties with respect to the Transaction unless and until the Parties have received their respective board approvals and definitive agreements memorializing the terms and conditions of the Transaction have been negotiated, executed and delivered by both of the Parties. Unless and until such definitive agreements are executed and delivered by both of the Parties, either [Enterprise] or ETP, for any reason, may depart from or terminate

3

the negotiations with respect to the Transaction at any time without any liability or obligation to the other, whether arising in contract, tort, strict liability or otherwise.

The Non-Binding Term Sheet sketched out the basic features of the potential transaction and envisioned that a "mutually agreeable Limited Liability Company Agreement would be entered into" to govern the joint venture.

Finally, in April the parties also signed a Reimbursement Agreement that provided the terms under which ETP would reimburse Enterprise for half the cost of the project's engineering work. That agreement, like the other two, recognized that the parties were "in the process of negotiating mutually agreeable definitive agreements" for the project and stated that nothing in it would "be deemed to create or constitute a joint venture, a partnership, a corporation, or any entity taxable as a corporation, partnership or otherwise." ETP's pleadings acknowledge that "as of the date of [these agreements] . . . the parties had not yet formed a partnership."

By May, the parties had formed an integrated team to pursue Double E. The biggest piece of the puzzle was obtaining sufficient shipping commitments. To do so, the parties needed to convince shippers that their pipeline would be the first to market. During the spring and summer of 2011, they marketed Double E to potential customers as a "50/50 JV" and prepared engineering plans for the project. The parties also explored the possibility of building a new pipeline from scratch rather than retrofitting Old Ocean, but they continued to market the Old Ocean conversion to potential customers.

A Federal Energy Regulatory Commission rule governing new interstate pipelines requires an "open season" of 30 to 45 days in which shippers are asked to commit to daily barrel volumes

4

and tariffs. For Double E to be viable, the parties needed shipping commitments of at least 250,000 barrels a day for ten years at a tariff of $3.00 per barrel. The initial open season was unsuccessful. Some shippers complained that the tariff was too high, others that the real need was for a pipeline running all the way from Alberta to the Gulf Coast. The parties extended the open season twice more. On the last day of the second extended open season, August 12, Chesapeake Energy Corp. committed to ship 100,000 barrels daily. ETP was hopeful that Chesapeake's commitment would draw in other shippers who had been holding out. But days earlier, Enterprise had begun preparing its exit by resuming negotiations with Enbridge. Enterprise ended its relationship with ETP orally on August 15 and then in writing a few days later.

The next month, ConocoPhillips announced that it would sell its interest in the Seaway pipeline. Enbridge bought it, making Enbridge co-owner of the pipeline with Enterprise. Enterprise and Enbridge obtained an anchor shipper commitment from Chesapeake, which resulted in their securing many additional commitments during the open season. Enterprise and Enbridge invested billions to reverse the direction of the pipeline and make other modifications needed to move oil from Cushing to the Gulf. The new pipeline, called Wrangler, opened in June 2012, and it has been a financial success.

ETP sued. Its theory at trial was that despite the disclaimers in the parties' written agreements, they had formed a partnership to "market and pursue" a pipeline through their conduct, and Enterprise breached its statutory duty of loyalty[4] by pursuing the Wrangler project with Enbridge. The jury answered "yes" to the question whether "ETP and Enterprise [had] create[d] a

---

[4] TEX. BUS. ORGS. CODE § 152.205.

partnership to market and pursue a pipeline project to transport crude oil from Cushing, Oklahoma to the Gulf Coast". It answered "no" to the question whether Enterprise had complied with its duty of loyalty. It found that $319,375,000 would compensate ETP for its damages and that the value to Enterprise of the benefit gained as a result of its misconduct was $595,257,433. The trial court reduced the disgorgement award to $150 million and otherwise rendered judgment on the verdict for ETP for a total of $535,794,777.40 plus postjudgment interest.[5]

The court of appeals reversed and rendered judgment for Enterprise.[6] The court concluded that the Texas Business Organizations Code (TBOC) allows parties to contract for conditions precedent to partnership formation; that the Letter Agreement in particular created two here that were not met—(1) execution of "definitive agreements memorializing the terms and conditions of the Transaction" that (2) have "received [each party's] respective board approvals"; and that ETP had the burden either to obtain a jury finding that the conditions were waived or to prove waiver conclusively, which it failed to do.[7] We granted ETP's petition for review.[8]

---

[5] ETP also sued Enbridge. The jury failed to find that Enbridge was part of a conspiracy to breach Enterprise's duty of loyalty to ETP. The trial court therefore rendered a take-nothing judgment against ETP on its claims against Enbridge.

[6] 529 S.W.3d at 545.

[7] *See id.* at 537–545. The court of appeals held alternatively that a partnership to "market and pursue" a pipeline cannot be a partnership under the TBOC as a matter of law because §152.051(b) requires "an association of two or more persons to carry on a business *for profit*" (emphasis added), and the limited-scope partnership pleaded by ETP did not have the potential for profit. 529 S.W.3d at 539. Because we affirm on an alternative basis, we decline to address this holding.

[8] 62 TEX. SUP. CT. J. 1311 (June 28, 2019).

**II**

Section 152.051(b) of the TBOC states that "an association of two or more persons to carry on a business for profit as owners creates a partnership, regardless of whether: (1) the persons intend to create a partnership; or (2) the association is called a 'partnership,' 'joint venture,' or other name." Under § 152.052(a),

> Factors indicating that persons have created a partnership include the persons':
>
> (1)      receipt or right to receive a share of profits of the business;
>
> (2)      expression of an intent to be partners in the business;
>
> (3)      participation or right to participate in control of the business;
>
> (4)      agreement to share or sharing:
>
>          (A)      losses of the business; or
>
>          (B)      liability for claims by third parties against the business; and
>
> (5)      agreement to contribute or contributing money or property to the business.

Section 152.003 provides that "[t]he principles of law and equity and the other partnership provisions supplement this chapter unless otherwise provided by this chapter or the other partnership provisions."

In *Ingram v. Deere*, we traced the evolution of Texas partnership law from the early common law, which required proof of five factors to establish a partnership, to TBOC Chapter 152, which

7

sets out a nonexclusive list of factors to be considered in a totality-of-the-circumstances test.[9] Under § 152.052(a)(2), "expression of an intent to be partners in the business" is just one factor of the totality-of-the-circumstances test.[10] We acknowledged in *Ingram* that the statute "does not by its terms give the parties' intent or expression of intent any greater weight than the other factors".[11] Moreover, under § 152.051(b), persons can create a partnership regardless of whether they intend to. This provision derives from Section 202(a) of the Revised Uniform Partnership Act.[12] A comment to that section drafted by the Uniform Law Commission warns that parties "may inadvertently create a partnership despite their expressed subjective intention not to do so."[13] But in *Ingram* we expressed skepticism that the Legislature "intended to spring surprise or accidental partnerships on independent business persons".[14] Can persons override the default test for partnership formation in Chapter 152 by agreeing not to be partners until conditions precedent are

---

[9] 288 S.W.3d 886, 893–898 (Tex. 2009); *id.* at 895 ("The common law required proof of all five factors to establish the existence of a partnership." (citing *Coastal Plains Dev. Corp. v. Micrea, Inc.*, 572 S.W.2d 285, 287 (Tex. 1978))); *id.* at 903–904 ("Whether a partnership exists must be determined by an examination of the totality of the circumstances."). In *Ingram*, the plaintiff's partnership claim was governed by the Texas Revised Partnership Act (TRPA), which was adopted in 1994, set out in the Revised Civil Statutes, and continued to apply to at least some partnerships through 2009. *Id.* at 894 & n.4. In 2003, the Legislature replaced the TRPA with the TBOC, but we acknowledged in *Ingram* that the "TRPA['s] and the TBOC's rules for determining partnership formation are substantially the same." *Id.* n.4; *see also* House Comm. on Admin., Bill Analysis at 1, Tex. H.B. 1156, 78th Leg., R.S. (2003) ("Unless otherwise noted, the provisions of this Code are nonsubstantive revisions of comparable provisions found in the . . . Texas Revised Partnership Act . . . .").

[10] *See Ingram*, 288 S.W.3d at 899.

[11] *Id.*

[12] *See* UNIF. P'SHIP ACT § 202(a) (NAT'L CONFERENCE OF COMM'RS ON UNIF. STATE LAWS 1997) ("[T]he association of two or more persons to carry on as co-owners [of] a business for profit forms a partnership, whether or not the persons intend to form a partnership.").

[13] *Id.* § 202 cmt. 1.

[14] *Ingram*, 288 S.W.3d at 898.

8

satisfied? *Ingram* did not involve such an agreement, and our discussion there of the role of intent in the partnership-formation analysis did not contemplate one.[15]

Section 152.003 imports other "principles of law and equity" into the partnership-formation analysis, and the use of the word "include" in § 152.052(a) makes the factors enumerated there nonexclusive. Against this backdrop of statutory law is a well-developed body of common law that "strongly favors parties' freedom of contract."[16] Our decisions recognizing this policy are decades older than the TBOC or its predecessor statute. In 1951, we quoted Sir George Jessel, "one of the most influential commercial law and equity judges" in 19th century Britain,[17] as saying:

> [I]f there is one thing which more than another public policy requires it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts when entered into freely and voluntarily shall be held sacred and shall be enforced by Courts of justice. Therefore, you have this paramount public policy to consider—that you are not lightly to interfere with this freedom of contract.[18]

---

[15] *See id.* at 899–901.

[16] *Gym-N-I Playgrounds, Inc. v. Snider*, 220 S.W.3d 905, 912 (Tex. 2007).

[17] *George Jessel (jurist)*, WIKIPEDIA, https://en.wikipedia.org/wiki/George_Jessel_(jurist) (last visited Jan. 24, 2020).

[18] *Wood Motor Co. v. Nebel*, 238 S.W.2d 181, 185 (Tex. 1951); *see also St. Louis Sw. Ry. Co. of Tex. v. Griffin*, 171 S.W. 703, 704 (Tex. 1914) ("The citizen has the liberty of contract as a natural right which is beyond the power of the government to take from him. The liberty to make contracts includes the corresponding right to refuse to accept a contract or to assume such liability as may be proposed.").

We reinforce this public policy virtually every Court Term.[19] Texas courts regularly enforce conditions precedent to contract formation and reject legal claims that are artfully pleaded to skirt unambiguous contract language, especially when that language is the result of arm's-length negotiations between sophisticated business entities.[20]

We have never squarely addressed whether parties' freedom to contract for conditions precedent to partnership formation can override the statutory default test, in which intent is a mere factor. ETP points to the 1978 case of *Coastal Plains Development Corp. v. Micrea, Inc.*, which involved an agreement between a landowner and a company that it contracted with to sell lots for a subdivision in Brazoria County.[21] The contract included a disclaimer that the parties' performance of their obligations under the contract "shall not constitute the parties as partners in connection therewith" or the formation of "a joint venture".[22] We acknowledged the rule that "when the record demonstrates that the actual effect of the arrangement resulting from the agreement is to create a

---

[19] *See, e.g.*, *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 230 (Tex. 2019) ("We have long recognized the strongly embedded public policy favoring freedom of contract. And, absent a compelling reason, courts must respect and enforce the terms of a contract that the parties have freely and voluntarily made." (citations omitted)); *Endeavor Energy Res., L.P. v. Discovery Operating, Inc.*, 554 S.W.3d 586, 595 (Tex. 2018); *Nafta Traders, Inc. v. Quinn*, 339 S.W.3d 84, 95–96 (Tex. 2011).

[20] *Cf. JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 656 (Tex. 2018) ("[W]orld-savvy participants entering into a complicated, multi-million-dollar transaction should be expected to recognize 'red flags' that the less experienced may overlook."); *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 812 (Tex. 2012) ("Contract enforcement is an 'indispensable partner' to the freedom of contract. Were we to hold in MasTec's favor, and conclude that El Paso must bear the risk of unknown underground obstacles under this contract, we would render meaningless the parties' risk-allocation agreement and ultimately prohibit sophisticated parties from agreeing to allocate risk in construction contracts." (quoting *Fairfield Ins. Co. v. Stephens Martin Paving, L.P.*, 246 S.W.3d 653, 664 (Tex. 2008))); *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 180 (Tex. 1997) (enforcing a disclaimer-of-reliance clause where "highly competent and able legal counsel represented both parties", "the parties were dealing at arm's length", and "both [parties were] knowledgeable and sophisticated business players").

[21] 572 S.W.2d 285, 286 (Tex. 1978).

[22] *Id.* at 286–287.

status different from that stated in the language of the contract, the parties' designation will not control."[23] But we also concluded that the partnership-disclaimer language "expressly negat[ed] any intent on . . . behalf of the parties to create a joint venture or partnership."[24] We ultimately held that the parties were not partners or participants in a joint venture "[b]ased upon [their] clearly expressed intent" and "the absence of any . . . provision for the sharing of losses".[25] When *Coastal Plains* was decided, the common law required the party claiming a partnership to prove five essential elements.[26] We merely held that two of them—intent to be partners and an agreement to share losses—were missing. *Coastal Plains* does not help answer the question presented here.

Enterprise points to the 1931 case of *Root v. Tomberlin*,[27] but it is not directly on point either. Plaintiff Root claimed that defendant Wentz had formed a partnership with another defendant, Tomberlin, and that Wentz was therefore jointly liable for money that Tomberlin owed Root under a well-drilling contract. Under the Tomberlin-Root contract, Tomberlin pledged as security for payment to Root a purchase order in which Wentz agreed to buy oil and gas leases from Tomberlin, but only if certain conditions were satisfied. The conditions were not satisfied, the transaction between Tomberlin and Wentz was not consummated, and Root was not fully paid. Wentz argued that the conditions precedent in the purchase order precluded the formation of a

---

[23] *Id.* at 287; *see also id.* at 288 ("Just as the words used by the parties in a contract do not necessarily control the substance of the relationship, the terms used by the parties in referring to the arrangement do not control.").

[24] *Id.* at 287.

[25] *Id.* at 288.

[26] *See id.* at 287; *Ingram v. Deere*, 288 S.W.3d 886, 895 (Tex. 2009) ("The common law required proof of all five factors to establish the existence of a partnership." (citing *Coastal Plains*, 572 S.W.2d at 287)).

[27] 36 S.W.2d 596 (Tex. App.—El Paso 1931, writ ref'd).

11

partnership, and we signaled our agreement.[28] But our explanation why no partnership was established pointed also to other facts, such as that "there [was] no sharing of profits".[29] In any event, *Root* did not involve a contractual provision like those here, which contemplate the potential creation of a business entity, but not until specific conditions had been performed.

ETP argues that the TBOC's totality-of-the-circumstances test controls partnership formation to the exclusion of the common law and that the parties' intent with respect to the creation of a partnership is just one factor to be weighed with the others in § 152.052(a). The submission of the case to the jury reflects this theory. Question 1 instructed the jury on the rule of § 152.051(b) that parties can form a partnership even if they do not intend to and on the multi-factor test in § 152.052(a). Question 1 also told the jury that "[n]o single fact may be stated as a complete and final test of partnership." It then asked the jury whether a partnership was created. Under ETP's view, submitted to the jury, parties cannot through contract language preclude the creation of a partnership until a specific condition has occurred or been performed. ETP argues that the key to avoiding an accidental partnership is to "avoid the conduct that establishes a partnership under the statute."[30]

Enterprise urges the primacy of freedom of contract and argues that if parties cannot by contract protect themselves from the creation of an unwanted partnership, detrimental economic consequences to the State and constant litigation will ensue. The Court has received amicus briefs

---

[28] *See id.* at 601.

[29] *Id.* at 601–602.

[30] Pet. Br. at 24.

12

weighing in on both sides from academics, industry representatives, a former legislator, and others.[31]

We maintain our view expressed a decade ago in *Ingram* that the Legislature did not "intend[] to spring surprise or accidental partnerships" on parties.[32] Section 152.003 expressly authorizes supplementation of the partnership-formation rules of Chapter 152 with "principles of law and equity", and perhaps no principle of law is as deeply engrained in Texas jurisprudence as freedom of contract. We hold that parties can contract for conditions precedent to preclude the unintentional formation of a partnership under Chapter 152 and that, as a matter of law, they did so here.[33]

## III

An agreement not to be partners unless certain conditions are met will ordinarily be conclusive on the issue of partnership formation as between the parties.[34] "Performance of a

---

[31] *Academics:* Professor Christine Hurt and Dean D. Gordon Smith, J. Reuben Clark School of Law at Brigham Young University, supporting petitioners; David Radunsky, University of North Texas College of Law, supporting petitioners; Joseph K. Leahy, South Texas College of Law, supporting petitioners; David Simon Sokolow, The University of Texas School of Law, supporting respondents.

*Industry:* Bobby Riley, supporting petitioners; John C. Ale, supporting respondents; Targa Resources Corp., supporting respondents; Plains Pipeline, L.P., supporting respondents; the Chamber of Commerce of the United States of America, the American Fuel & Petrochemical Manufacturers, and the Texas Association of Business, supporting respondents; Hugh Rice Kelly, supporting respondents.

*Legislature:* Hon. Jim Rudd, supporting petitioners.

*Others:* Associated Builders and Contractors of Texas, Inc., supporting respondents; Houston Realty Business Coalition, supporting respondents; Austin Economic Club, supporting petitioners.

[32] *Ingram v. Deere*, 288 S.W.3d 886, 898 (Tex. 2009).

[33] The court of appeals limited its analysis to the Letter Agreement because it "contains the clearest language". 529 S.W.3d 531, 537 (Tex. App.—Dallas 2017). We reject ETP's unpersuasive arguments that (1) the Letter Agreement does not create conditions precedent to partnership formation because the "Non-Binding" nature of the attached Term Sheet rendered the conditions precedent in the Agreement nonbinding too; (2) the conditions stated in the Agreement are not enforceable because the Agreement contemplates a future contract; and (3) Texas law does not recognize conditions precedent to contract formation. *Cf. Hohenberg Bros. Co. v. George E. Gibbons & Co.*, 537 S.W.2d 1, 3 (Tex. 1976) ("A condition precedent may be either a condition to the formation of a contract or to an obligation to perform an existing agreement.").

[34] Such an agreement would not, of course, bind third parties, and we do not consider its effect on them.

condition precedent, however, can be waived or modified by the party to whom the obligation was due by word or deed."[35] We agree with the court of appeals that under Texas Rule of Civil Procedure 279, ETP was required either to obtain a jury finding on waiver or to prove it conclusively.[36] It has done neither.

In *Ingram*, we explained that when analyzing the second factor of § 152.052(a)'s totality-of-the-circumstances test, "expression of an intent to be partners in the business":

> Courts should only consider evidence not specifically probative of the other factors. In other words, evidence of profit or loss sharing, control, or contribution of money or property should not be considered evidence of an expression of intent to be partners. Otherwise, all evidence could be an "expression" of the parties' intent, making the intent factor a catch-all for evidence of any of the factors, and the separate "expression of intent" inquiry would be eviscerated.[37]

Similarly, where waiver of a condition precedent to partnership formation is at issue, only evidence directly tied to the condition precedent is relevant. Evidence that would be probative of expression of intent under § 152.051(a)—such as "the parties' statements that they are partners, one party holding the other party out as a partner on the business's letterhead or name plate, or in a signed partnership agreement"[38]—is not relevant. Nor is evidence that would be probative of any

---

[35] *Ames v. Great S. Bank*, 672 S.W.2d 447, 449 (Tex. 1984).

[36] *See* TEX. R. CIV. P. 279 ("Upon appeal all independent grounds of recovery or of defense not conclusively established under the evidence and no element of which is submitted or requested are waived."); *Island Recreational Dev. Corp. v. Republic of Tex. Sav. Ass'n*, 710 S.W.2d 551, 554 (Tex. 1986) ("We recognize that waiver is an independent ground of recovery or defense and must be pleaded and proved as such."); *Washington v. Reliable Life Ins. Co.*, 581 S.W.2d 153, 157 (Tex. 1979) ("Waiver was an affirmative defense upon which Washington had the burden of proof. No special issues were requested or submitted to the jury on this point. As stated above, a party generally waives an issue upon which he relies by failure to request its submission." (citations omitted)).

[37] 288 S.W.3d at 900.

[38] *Id.*

14

of the other § 152.052(a) factors. Otherwise, a party in ETP's position could claim waiver in virtually every case.

ETP has not pointed to any evidence that Enterprise specifically disavowed the Letter Agreement's requirement of definitive, board-of-directors-approved agreements or that Enterprise intentionally acted inconsistently with that requirement.[39] ETP's challenge to the court of appeals' holding is premised on the argument we have already rejected that the effect of the conditions precedent in the Letter Agreement was subsumed in Question 1. The only record evidence that ETP points to—the parties held themselves out as partners and worked closely together on the Double E project—is not relevant to the issue of waiver of definitive, board-approved agreements.

\*       \*       \*       \*       \*

We hold that parties can conclusively negate the formation of a partnership under Chapter 152 of the TBOC through contractual conditions precedent. ETP and Enterprise did so as a matter of law here, and there is no evidence that Enterprise waived the conditions. The judgment of the court of appeals is affirmed.

_____
Nathan L. Hecht
Chief Justice

Opinion delivered: January 31, 2020

---

[39] _LaLonde v. Gosnell_, ___S.W.3d___, ___ (Tex. 2019) (waiver can be shown by "intentional conduct inconsistent with claiming [a known] right").